884 So.2d 801 (2003)
MOBILE INFIRMARY MEDICAL CENTER
v.
James HODGEN.
1011932.
Supreme Court of Alabama.
October 31, 2003.
Rehearing Denied January 16, 2004.
*804 Walter W. Bates and Robert P. MacKenzie III of Starnes & Atchison, LLP, Birmingham; and W. Christian Hines III and John Peter Crook McCall of Starnes & Atchison, LLP, Mobile, for appellant.
Andrew T. Citrin and Michael S. McGlothren of Citrin & McGlothren, P.C., Daphne, for appellee.
Robert A. Huffaker and R. Austin Huffaker, Jr., of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for amicus curiae Medical Association of the State of Alabama, in support of the appellant.
Deborah Alley Smith of Christian & Small, LLP, Birmingham; and Joana S. Ellis of Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery, for amicus curiae Alabama Defense Lawyers Association, in support of the appellant.
David G. Wirtes, Jr., and George M. Dent III of Cunningham, Bounds, Yance, Crowder & Brown, LLC, Mobile; R. Edwin Lamberth of Heninger, Burge, Vargo & Davis, LLP, Birmingham; and Nancy L. Eady of Morris, Haynes & Hornsby, Alexander City, for amicus curiae Alabama Trial Lawyers Association, in support of the appellee.
PER CURIAM.
Mobile Infirmary Medical Center appeals from the trial court's judgment, entered on a jury verdict, in favor of James Hodgen. We affirm conditionally.

Facts and Procedural History
In February 2000, 58-year-old James Hodgen was a patient in the intensive care unit of the Mobile Infirmary Medical Center recovering from cardiac bypass surgery. Hodgen's recovery progressed normally until he began to develop cardiac arrhythmia, or abnormal heart rhythms, two days after the surgery. The Mobile Infirmary employee overseeing Hodgen's care, Dawn Byrd, a recent nursing school graduate, informed a supervising nurse, Tammy Espiritu, that Hodgen was experiencing arrhythmia. Espiritu instructed Byrd to telephone Hodgen's cardiologist, Dr. Chris Brown. When Byrd telephoned Dr. Brown and advised him of Hodgen's condition, Dr. Brown prescribed .25 milligrams of digoxin. Byrd mistakenly informed Espiritu that Dr. Brown had prescribed 1.25 milligrams of digoxin, and Espiritu telephoned the order to the pharmacy.
Espiritu, believing that Hodgen's condition was worsening, told Byrd not to wait for the pharmacy to deliver the medication. Instead, Espiritu instructed Byrd to obtain the digoxin from the stock of medicine maintained in the intensive care unit and to administer it to Hodgen. Without supervision from Espiritu, Byrd obtained three vials, or ampules, of digoxin and emptied at least two and a half of the vials directly into Hodgen's intravenous tube. Shortly after Byrd had administered the digoxin to Hodgen, the pharmacy called Espiritu, questioning the amount of digoxin she had ordered. It was then that Byrd and Espiritu realized that Byrd had administered to Hodgen five times the amount of digoxin Dr. Brown had actually prescribed.
When Hodgen began to experience complications the next evening resulting from digoxin toxicity, he was administered Digibind, an antidote for digoxin toxicity. After the Digibind was administered, Hodgen's heart stopped beating and one of the nurses began to "mechanically pace his heart." Hodgen's blood pressure then dropped to a very low level and the oxygen-saturation level in his blood became extremely low. Hodgen stopped breathing, and the hospital staff began CPR and other forms of intervention to revive Hodgen. *805 Hodgen was revived, but he suffered damage to various organs as a result of severe oxygen deprivation. Hodgen later underwent surgery to remove a portion of his intestines and to amputate his right leg. Hodgen is now unable to walk, must use a colostomy bag, and claims that his mental capacity is diminished.
On January 29, 2001, Hodgen sued Mobile Infirmary in the Mobile Circuit Court under the Alabama Medical Liability Act, § 6-5-480 et seq., Ala.Code 1975 (hereinafter referred to as the "AMLA"). Specifically, Hodgen alleged that Mobile Infirmary had been negligent and/or wanton in administering the digoxin and in supervising its employees. James's wife, Judy Hodgen, also sued Mobile Infirmary, stating a derivative claim alleging loss of consortium. The Hodgens sought both compensatory and punitive damages. The case went to trial in April 2002.
The evidence at trial indicated that Byrd, although assigned to care for various patients in the intensive care unit at Mobile Infirmary, was not a licensed nurse. She was a recent graduate of nursing school and, when she administered the digoxin overdose to Hodgen, she had taken but had not yet received the results from her nursing board examination.[1] The supervising nurse that evening, Espiritu, had passed her nursing board examination only seven months before the overdose was administered and had never worked with Byrd before that occasion. Additionally, the charge nurse for that evening had assigned Byrd and Espiritu separate patients, instead of having Byrd work under Espiritu's direct supervision. Espiritu testified that she understood that her responsibility in supervising Byrd was merely to answer any questions Byrd might have had.
Byrd testified that she had never administered digoxin before she administered it to Hodgen. Byrd stated that although normally her "nursing mentor" made telephone calls to a doctor about a patient, she believed that the nursing staff, in having her make the telephone calls to the doctor, was trying to help her get experience in speaking with the doctors. She said that she had telephoned doctors to advise them of the condition of their patients no more than five times before her call to Dr. Brown, and that she found such calls difficult. Byrd further admitted that when Dr. Brown prescribed the digoxin, she did not attempt to repeat his order to him or to confirm in any way the dosage he had prescribed. Byrd acknowledged that too much digoxin can be harmful to a patient.
Dr. Ray Lash, the Hodgens' medical expert, testified that Hodgen's symptoms after the digoxin overdose were consistent with digoxin toxicity. Dr. Lash further testified that, generally, digoxin that is to be given intravenously is delivered to hospitals in prepackaged vials, or ampules. According to Dr. Lash, a normal dosage of digoxin is about one-half of a vial, but the maximum dosage that should be administered to an average person is one vial. Dr. Lash testified that a medical professional in an intensive care unit should have known that medications are generally packaged so that one container is the maximum dose for one person. He further stated that a qualified nurse should have known something was wrong when, to administer the prescribed dose of digoxin to a patient, she had to use three vials of the medicine. Dr. Lash expressed his opinion that Byrd was inadequately trained, that she was put in a position where she was "in over her head," and that Mobile Infirmary *806 failed to put safeguards into place to prevent Byrd's inexperience from hurting patients.
Mobile Infirmary elicited testimony at trial indicating that James Hodgens's medical bills were paid by Medicare and by a private insurer.
After the close of all of the evidence, the trial court charged the jury on negligence and wantonness and on compensatory damages and punitive damages. The jury deliberated for one day and returned the following verdict form:
"Claim of James Hodgen

"I. We, the Jury, find in favor of the Plaintiff, James Hodgen, and assess damages as follows:

"Past Damages: $ 0
 ____________
"Future Damages: $ 0
 ____________
"Punitive Damages (if applicable): $ 2,250,000.00
 ____________
"Total Damages: $ 2,250,000.00
 ____________

"Claim of Judy Hodgen

"II. We, the Jury, find in favor of the Plaintiff, Judy Hodgen, and assess damages as follows:

"Past Damages: $ 0
 ____________
"Future Damages: $ 0
 ____________
"Total Damages: $ 0
 ____________
 "[Signature]
 "Foreman

"OR

"I. We, the Jury find for the Defendant, Mobile Infirmary Medical Center."
 "___________
 "Foreman"
After consulting with counsel for both parties as to any possible concerns they might have about the jury's verdict, the trial court entered a judgment in favor of James Hodgen awarding him $2,250,000 in punitive damages and a judgment in favor of Judy Hodgen awarding her $0. The trial court denied Mobile Infirmary's posttrial motions and refused to remit the punitive-damages award. In support of its refusal to remit the award, the trial court purported to find that, at trial, James Hodgen produced evidence that he had incurred $1,600,000 in compensatory damages. Mobile Infirmary appeals the judgment entered in favor of James Hodgen.

Discussion

I.
Mobile Infirmary argues that the trial court erred in entering a judgment on the jury verdict because it awarded the plaintiff only punitive damages and, Mobile Infirmary argues, the jury must award compensatory damages before it can award punitive damages. See Life Ins. Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998)(a jury must award compensatory or nominal damages to a plaintiff before it can award punitive damages). Thus, Mobile Infirmary argues that this Court should reverse the judgment in favor of Hodgen and render a judgment in favor of Mobile Infirmary. Hodgen responds that any error by the trial court in entering a judgment awarding only punitive damages was invited by Mobile Infirmary when its own counsel affirmatively represented to the trial court that the jury could make such an award. We agree.
Immediately after the jury read its verdict in this case, the trial court dismissed the jurors into the jury room to await a final discharge from their duties. The following discussion then took place:
"The Court: Let me see the lawyers.
"Court Reporter: Do you want me, Judge?
"The Court: Yeah.
"Here it is. I think it's notit's acceptable but it's an odd verdict. It doesn't make sense but it'sI think it's a good verdict. What do you think, Billy [Bates, counsel for Mobile Infirmary]? Not to awardno award of compensatory *807 damages]. They found on the wantonness count. I suppose you could say thatI think they can do it.
"Mr. Bates: I do too.
"The Court: I think it's strange
"Mr. Bates: I do too.
"The Court: All right. Well, I'm goingdo y'all want me to poll them?
"Mr. Bates: (Shakes head negatively.)
"Mr. Citrin [counsel for Hodgen]: (Shakes head negatively.)
"The Court: All right. Well, here's what I'm going to do: I'm going to tell them to go out that way to get their checks and thank you very much."
After the jury was discharged, Mobile Infirmary filed a motion for a judgment as a matter of law ("JML"),[2] arguing, despite its earlier representation to the trial court that the jury could make such an award, that the trial court's judgment on the jury verdict was improper because the jury failed to award compensatory or nominal damages. At the hearing on the motion, counsel and co-counsel for Mobile Infirmary admitted that they had previously represented to the trial court that they believed the verdict was proper, but that they were taking a different position on the posttrial motion.[3] The trial court, in denying Mobile Infirmary's renewed motion for a JML, explained:
"When the jury initially returned its verdict, the Court asked the jury to wait in the jury deliberation room while the attorneys and the Court discussed [the] verdict. The record establishes that this Court specifically asked counsel for [Mobile Infirmary] whether the jury could do what it had done, i.e., award substantial punitive damages without compensatory or nominal damages. Counsel for [Mobile Infirmary] affirmatively represented to this Court that the jury could do what it had done.
"If [Mobile Infirmary] had indicated there was anything wrong with the jury's verdict, had indicated anything less than its total acceptance of the jury's verdict, or had even voiced suspicions or doubts about the form or substance of the jury's verdict, then this Court would have proceeded with appropriate action. The jury had not been discharged. The Court would have brought the jury back in and recharged the jury....
"....
"The actions of [Mobile Infirmary] in approving of the court's action in allowing the verdict, and yet now taking a nearly opposite position in claiming the verdict is invalid, falls squarely within the invited error doctrine....
"....
"... This is the rare case where the Court made specific inquiry on the record and [Mobile Infirmary] affirmatively took a position on the record. The invited error is all the more apparent because it would have been a simple matter for this Court to give a supplemental charge that would have remedied any defect.... Thus, while [Mobile Infirmary] is now claiming it is making some sort of substantive argument, if anything, [Mobile Infirmary] is making an *808 attempt to place form over substance so as to prevent justice from being done."
The law is well settled that a party may not induce an error by the trial court and then attempt to win a reversal based on that error. "A party may not predicate an argument for reversal on `invited error,' that is, `error into which he has led or lulled the trial court.'" Atkins v. Lee, 603 So.2d 937, 945 (Ala.1992)(quoting Dixie Highway Express, Inc. v. Southern Ry., 286 Ala. 646, 651, 244 So.2d 591, 595 (1971)). "That doctrine [of invited error] provides that a party may not complain of error into which he has led the court." Ex parte King, 643 So.2d 1364, 1366 (Ala.1993). "A party cannot win a reversal on an error that party has invited the trial court to commit." Neal v. Neal, 856 So.2d 766, 784 (Ala.2002). See also Liberty Nat'l Life Ins. Co. v. Beasley, 466 So.2d 935, 937 (Ala.1985); State Farm Mut. Auto. Ins. Co. v. Humphres, 293 Ala. 413, 418, 304 So.2d 573, 577 (1974).
Accordingly, Mobile Infirmary cannot, on the one hand, represent to the trial court that the jury verdict was proper, thus inducing the trial court to enter a judgment on that verdict, and then, on the other hand, argue in posttrial motions that the jury verdict was improper and that Mobile Infirmary is entitled to have a judgment rendered in its favor. Because any error committed by the trial court in entering a judgment upon the jury verdict in this case was invited by Mobile Infirmary, Mobile Infirmary's argument that it is entitled to have a judgment rendered in its favor on this basis must fail.[4]

II.
Mobile Infirmary argues that the trial court erroneously denied its renewed motion for a JML because, it says, Hodgen failed to produce sufficient evidence of wantonness to support the jury's award of punitive damages. At trial, Hodgen alleged two factual bases for his wantonness claim against Mobile Infirmary. First, Hodgen argued that Mobile Infirmary acted wantonly in administering the digoxin to him after his heart surgery. Second, Hodgen argued that Mobile Infirmary acted wantonly in its failure to adequately train and supervise its nurses.
Our standard of review for a renewed motion for a JML is well settled:
"In reviewing the trial court's ruling on a motion for a JML, an appellate court uses the same standard the trial court used in ruling on the motion initially. Thus, '"we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination."' Acceptance Ins. Co. v. Brown, [832] So.2d [1, 12] (Ala.2001), quoting American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala.1993); see, also, Jim Walter Homes, Inc. v. Kendrick, 810 So.2d 645, 649-50 (Ala.2001)."
Hicks v. Dunn, 819 So.2d 22, 23-24 (Ala.2001). Thus, in reviewing the evidence in this case, we are required to construe the facts and any reasonable inferences that *809 the jury could have drawn from them most favorably to Hodgen.
Section 6-11-20(a), Ala.Code 1975, provides that a jury may award punitive damages only if the plaintiff demonstrates by clear and convincing evidence that the defendant has consciously or deliberately engaged in oppression, fraud, wantonness, or malice. Section 6-11-20(b)(3), Ala.Code 1975, defines wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." That Code section further defines "clear and convincing evidence" as follows:
"Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
§ 6-11-20(b)(4), Ala.Code 1975.
As to Hodgen's claim that Mobile Infirmary wantonly administered the digoxin, Mobile Infirmary contends that Hodgen failed to produce clear and convincing evidence of wantonness because, it argues, neither Espiritu nor Byrd intended to hurt Hodgen. In support of this claim, Mobile Infirmary quotes Espiritu's and Byrd's testimony in which both averred that they did not intend to hurt Hodgen when they administered the digoxin. However, one does not have to demonstrate an intent to harm to prove wantonness:
"In Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250 (Ala.1998), this Court stated, `To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff.' Wantonness is defined by statute as `[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.' Ala.Code 1975, § 6-11-20(b)(3). In Roush, citing Bozeman v. Central Bank of the South, 646 So.2d 601 (Ala.1994), we described wantonness as `the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act injury will likely or probably result.' 723 So.2d at 1250."
Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1211 (Ala.1999). See also 57A Am.Jur.2d Negligence § 284 (1989)("Wanton conduct involves a heedless and reckless disregard for the rights of another person, with consciousness that a pertinent act or omission may result in injury to another.").
It appears that, in making such an argument, Mobile Infirmary confuses the definition of "wantonness" with "willfulness." As this Court has noted regarding the distinction between "wantonness" and "willfulness": "The two are different and distinct concepts...." Lyons v. Walker Reg'l Med. Ctr., Inc., 868 So.2d 1071, 1089 (Ala.2003).
"To constitute `willful or intentional injury,' there must be knowledge of danger accompanied with a design or purpose to inflict injury, whether the act be one of omission or commission. To constitute `wantonness' the design may be absent if the act is done with knowledge of its probable consequence and with a reckless disregard of those consequences....
"....
"Further in Atlantic Coast Line R. Co. v. Brackin, 248 Ala. 459, 461, 28 So.2d 193, 194 [(1946),] we said:
"`A willful or intentional act is not involved in wantonness, which may *810 consist of an inadvertent failure to act by a person with knowledge that someone is probably in peril and the act or failure to act is in reckless disregard of the consequences....'"
English v. Jacobs, 263 Ala. 376, 379, 82 So.2d 542, 545 (1955). Thus, in order to support his claim that the overdose was the result of wantonness in the administration of the digoxin, Hodgen was not required to show that Espiritu and Byrd acted with an intent to harm him. Instead, Hodgen merely had to produce clear and convincing evidence demonstrating that Espiritu and Byrd, while conscious of the potential danger of their actions, acted with reckless disregard as to the consequences of those actions.
In Walker v. Humana Medical Corp., 415 So.2d 1107 (Ala.Civ.App.1982), the Court of Civil Appeals upheld a wantonness claim against a phlebotomist, a hospital employee responsible for taking blood samples, when, in preparation for giving a blood transfusion to Billy Walker, she mistakenly took a blood sample from another patient, believing that she had obtained a blood sample from Walker. Witnesses testified that when the phlebotomist took the blood sample from the wrong patient, she did not check the patient's armband for his name, she did not call the patient by name, and she did not ask the patient what his name was. As a result, the phlebotomist matched the wrong blood type for the transfusion and Walker received a transfusion of blood that was not his blood type.
The Court of Civil Appeals held that Walker had produced sufficient evidence demonstrating that the phlebotomist was conscious of the potential danger of her actions. The phlebotomist was aware of the complications that occur from a transfusion of incompatible blood and she was aware of the crucial need to correctly identify the patients from whom she was taking blood samples to prevent such complications. The court held that, despite her knowledge of the danger of complications, however, the phlebotomist acted in reckless disregard of Walker's health when, in preparation for Walker's transfusion, she took a blood sample from a patient without making any effort to determine whether that patient was actually the patient scheduled to receive the transfusion. Because Walker demonstrated that the phlebotomist "had knowledge of the conditions which would make her conscious act of drawing blood from a patient she had not identified likely to cause injury," the Court of Civil Appeals upheld the jury's verdict as to Walker's wantonness claim. Walker, 415 So.2d at 1110. See also Harco Drugs, Inc. v. Holloway, 669 So.2d 878 (Ala.1995)(plaintiffs presented sufficient evidence of wantonness where a pharmacist, with knowledge that an illegible prescription was written by an oncologist, mistakenly filled the prescription for a cancer-fighting drug with a dangerous heart medication); Wal-Mart Stores, Inc. v. Robbins, 707 So.2d 284 (Ala.Civ.App.1997)(upholding a wantonness claim where a pharmacist, believing she had correctly interpreted a prescription, failed to consult with the prescribing physician and mistakenly filled a prescription with medication that was too strong). Compare Cackowski v. Wal-Mart Stores, Inc., 767 So.2d 319 (Ala.2000)(plaintiffs presented insufficient evidence of wantonness when a pharmacist, who had misread and wrongly filled a prescription, should not have become suspicious of the mistake).
We hold that Hodgen has produced evidence, which, if believed by the jury, would constitute clear and convincing evidence that Mobile Infirmary wantonly administered the digoxin, resulting in an *811 overdose. Espiritu testified that she was aware that digoxin was a potentially deadly drug and that it was important to administer the drug in the correct dosage. She further stated that she knew that Byrd was not a licensed nurse when she administered the digoxin. Espiritu admitted that she had no idea whether Byrd had had any previous experience in administering digoxin and that she made no attempt to find out. However, despite her awareness of the danger of the drug and her awareness of Byrd's inexperience in nursing, Espiritu told Byrd to obtain digoxin from the stock of medicine kept "on the floor" and to administer it to Hodgen. Espiritu made no attempt to ascertain Byrd's experience in administering the drug and she made no attempt to supervise Byrd's actions in obtaining and administering the drug. In fact, while Byrd was in Hodgen's room administering the digoxin, Espiritu was in another room.
Byrd testified that she knew that digoxin had the potential to completely stop a patient's heart and that she understood the importance of administering it in the correct dosage. She admitted that she did not know the correct dosage of digoxin for a patient and that she had never before administered the drug. She also stated that she found making the telephone calls to doctors to advise them of the status of their patients and to receive orders difficult. However, despite Byrd's awareness of the dangers of digoxin, despite her knowledge of her own inexperience in administering it, and despite the difficulty she had telephoning reports to doctors and taking their orders over the telephone, she made no attempt to verify the prescription with the doctor; she chose to access what she thought was the appropriate amount of digoxin on her own from the stock kept on the floor; and she chose to administer the drug to Hodgen without any supervision, all in reckless disregard of the dangers her actions presented to Hodgen.
The evidence shows that Espiritu and Byrd were aware of the potential danger of their actionsthey both knew digoxin was a potentially deadly drug if given in too strong a doseand yet they acted recklessly in disregard of the dangers to Hodgen's health. Hodgen has produced clear and convincing evidence from which the jury could have concluded that Mobile Infirmary acted recklessly and in a conscious disregard for his safety in administering the digoxin. Because Hodgen has presented clear and convincing evidence from which the jury could conclude that Mobile Infirmary acted wantonly in administering the digoxin to him, it is unnecessary to address Hodgen's claim that it was wanton in its training and supervision of Espiritu and Byrd.[5]

III.
Mobile Infirmary argues that the trial court should have declared a mistrial after it made an allegedly prejudicial remark to a potential juror. During voir dire, the following exchange took place:
"The Court:.... Does anybody else know anybody or have you done business with any of the people on [Mobile Infirmary's] side or are you related by blood or marriage to any one of the people whose names have been called out and identified by the Defense? Yes, sir. Who are you?
"Prospective Juror:.... The company I work for does business with Mobile Infirmary.

*812 "The Court: Okay.... Nowand that's an important client, I assume.
"Prospective Juror: Absolutely.
"The Court: You understand that if you're on a jury that ruled against them, they might find out about it and take your business away from you? Do you understand that?
"Prospective Juror: It could happen but I doubt it seriously.
"The Court: So you think you can be fair and impartial?
"Prospective Juror: Yes, sir.
"The Court: You know you can be fair and impartial?
"Prospective Juror: Yes, sir.
"The Court: All right.... Now, I can't rememberit's all sort of running together. It must be April Fool's Day. Did I tell you if any of these questions embarrass you, you can come forward? Okay, good. Are any of you a witness in this case?
"Mr. MacKenzie [counsel for Mobile Infirmary]: Judge, I respectfully move for a mistrial because of this: there's been a question raised by your Honor to [a prospective juror] who does business with Mobile Infirmary ... there's a direct statement, much more than an inference, if he was to rule a verdict in favor of the Defendant [sic] that there would be some consequences and his business would be lost. And he said no but the clear message to the jury is there may be some consequences, whether it be with their business or friends, and it's the wrong message to send at this point in the time.
"We're faced with the conspiracy theory and now they're being told if you don't go with the Infirmary, something's going to happen. I know it wasn't intentional but, at the same time, I'm
"The Court: No, I don't mind
"....
"Mr. McGlothren [counsel for Hodgen]: I think giving a curative instructionat this point, tell the jury that you don't mean to imply anything by that but it's important that we get jurors who are not biased.
"I will make this easy. We're going to strike [the prospective juror] anyway. He's not going to be on the jury, and if Mr. MacKenzie wants a curative
"....
"The Court [speaking to the jury]: The lawyers have a right and a dutyit's their responsibility to call my attention to things that I might say that are improper. I don't think it was improper but let me say this as a curative instruction. I told [the prospective juror] that there might be some sort of consequence to his business on how he ruled one way or the other. I want you to disregard that. That was improper, shouldn't have been said.
"We want a jury that will be fair and impartial regardless of their feelings or emotions, and so I want you to disregard any comment I made to [the prospective juror] about consequences of the outcome of this case."
Mobile Infirmary did not object to the curative instruction and did not move for a mistrial after the instruction was given. In fact, at no point after the trial court gave the curative instruction did Mobile Infirmary voice any dissatisfaction with the trial court's action. Additionally, Mobile Infirmary made no mention of this issue in its motion for a partial summary judgment, in its motion for a JML, or in its renewed motion for a JML.
"`"`[I]t is a necessary corollary of our adversary system in which issues are framed by the litigants and presented to a court; ... fairness to all *813 parties requires a litigant to advance his contentions at a time when there is an opportunity to respond to them factually, if his opponent chooses to; ... the rule promotes efficient trial proceedings; ... reversing for error not preserved permits the losing side to second-guess its tactical decisions after they do not produce the desired result; and ... there is something unseemly about telling a lower court it was wrong when it never was presented with the opportunity to be right. The principal rationale, however, is judicial economy. There are two components to judicial economy: (1) if the losing side can obtain an appellate reversal because of error not objected to, the parties and public are put to the expense of retrial that could have been avoided had an objection been made; and (2) if an issue had been raised in the trial court, it could have been resolved there, and the parties and public would be spared the expense of an appeal.'"'
"Ex parte Elba Gen. Hosp., 828 So.2d 308, 314 (Ala.2001), quoting Cantu v. State, 660 So.2d 1026, 1031-32 (Ala.1995) (Maddox, J., concurring in part and dissenting in part), quoting in turn State v. Applegate, 39 Or.App. 17, 21, 591 P.2d 371, 373 (1979)."
Birmingham Hockey Club, Inc. v. National Council on Compensation Ins., Inc., 827 So.2d 73, 80 (Ala.2002). Thus, by failing to raise to the trial court at any time after the curative instruction was given its contention that the instruction did not cure the alleged prejudice, Mobile Infirmary has waived any argument it may have had on appellate review as to this issue.
Furthermore, we note that Mobile Infirmary has failed to carry its burden as to this argument.
"We will not reverse a judgment `unless ... the error complained of has probably injuriously affected substantial rights of the parties.' Rule 45, [Ala.] R. App. P.; Bianco v. Graham, 268 Ala. 385, 388, 106 So.2d 655, 657 (1958). The appellant bears the burden of proof on this issue. Roubicek v. Roubicek, 246 Ala. 442, 21 So.2d 244 (1945). This standard ... requires more than an allegation of `some possibility that the jury could get some adverse thought....' "
Atkins v. Lee, 603 So.2d at 946. In its brief to this Court, Mobile Infirmary merely alleges that there is a possibility that the jury venire was prejudiced by the trial court's question to the potential juror and that the trial court's curative instruction was insufficient. We believe that Mobile Infirmary has failed to show that the trial court's actions probably injuriously affected Mobile Infirmary's substantial rights; therefore, Mobile Infirmary has failed to meet its burden in arguing for a reversal of the judgment.

IV.
Mobile Infirmary next invites this Court to revive § 6-5-544(b), Ala.Code 1975, which, at one time, placed a $400,000 cap on the noneconomic damages that could be awarded in a medical-malpractice case. In Moore v. Mobile Infirmary Association, 592 So.2d 156 (Ala.1991), we declared § 6-5-544(b), Ala.Code 1975, unconstitutional, holding that the cap violated the right to a trial by jury and the equal-protection guarantees under the Alabama Constitution. Mobile Infirmary argues that because this Court has since acknowledged that a cap on punitive damages does not violate the right to a trial by jury under the Alabama Constitution, see Ex parte Apicella, 809 So.2d 865 (Ala.2001), and because this Court has acknowledged that the Alabama Constitution contains no equal-protection clause, see Ex parte Melof, *814 735 So.2d 1172 (Ala.1999), this Court should overrule Moore, supra, reinstate the $400,000 cap and apply the cap to Hodgen's punitive-damages award in this case. We decline Mobile Infirmary's invitation to revive § 6-5-544(b), Ala.Code 1975, because, since we decided Moore, the Legislature has explicitly addressed this issue.
The Legislature, when it enacts legislation, is presumed to have knowledge of existing law and of the judicial construction of existing statutes. See Ex parte Fontaine Trailer Co., 854 So.2d 71 (Ala.2003). Thus, with the knowledge that § 6-5-544(b), Ala.Code 1975, had been declared unconstitutional in 1991 and that § 6-11-21, Ala.Code 1975, which provided a general cap on punitive-damages awards, had been declared unconstitutional in 1993, see Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), the Legislature in 1999 rewrote § 6-11-21, Ala.Code 1975, to provide caps on punitive-damages awards to apply "in all civil actions," except in class actions, wrongful-death actions, and actions alleging the intentional infliction of physical injury. Section 6-11-21(a), (b), (d), (h), and (j), Ala.Code 1975. Section 6-11-21, Ala.Code 1975, as so amended, has been recognized as a complete replacement of the old statutory restrictions on punitive damages. See Morris v. Laster, 821 So.2d 923, 927 (Ala.2001).
The fundamental principle of statutory construction is that words in a statute must be given their plain meaning. See Simcala, Inc. v. American Coal Trade, Inc., 821 So.2d 197, 202 (Ala.2001)(citing Ex parte Smallwood, 811 So.2d 537, 539 (Ala.2001); Ex parte Krothapalli, 762 So.2d 836, 838 (Ala.2000); and IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)); Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., 746 So.2d 966, 969 (Ala.1999)(citing John Deere Co. v. Gamble, 523 So.2d 95 (Ala.1988)). Section 6-11-21(d), Ala.Code 1975, provides:
"(d) Except as provided in subsection (j), in all civil actions for physical injury wherein entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or one million five hundred thousand dollars ($1,500,000), whichever is greater."
(Emphasis added.) As noted above, the only exclusions from this cap on punitive-damages awards for claims alleging physical injury are class actions, wrongful-death actions, and actions alleging the intentional infliction of physical injury. The wording of this statute, i.e., that it applies to "all civil actions," clearly encompasses actions alleging physical injury caused by medical malpractice. Although the Legislature excluded from this statute certain types of claims, the statute makes no mention of excluding actions brought pursuant to the AMLA. Because the Legislature, with knowledge of this Court's holding as to § 6-5-544(b), Ala.Code 1975, enacted a new statutory cap on punitive damages that clearly encompasses claims brought pursuant to the AMLA, we decline Mobile Infirmary's invitation to revisit the Moore decision, despite the erosion of its holdings, and to reinstate § 6-5-544(b), Ala.Code 1975.

V.
Mobile Infirmary argues that the trial court erred in refusing to apply the cap on punitive damages established in § 6-11-21(d), Ala.Code 1975, to the $2,250,000 punitive-damages award in this case. As noted in Part IV of this opinion, § 6-11-21(d) provides that, subject to an exception not applicable to this proceeding, "in all *815 civil actions for physical injury wherein entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or one million five hundred thousand dollars ($1,500,000), whichever is greater."
The trial court in its order denying Mobile Infirmary's postjudgment motion cited Life Insurance Co. of Georgia v. Smith, 719 So.2d 797, 814-15 (Ala.1998), in which this Court discussed in detail the circumstance under which a nominal damages award would nevertheless permit a substantial punitive-damages award. This Court stated in Smith:
"In instances where punitive damages also are awarded, a court can consider, in any post-verdict analysis of the relationship between the compensatory damages award and the punitive damages award, the total amount of compensatory damages for which the defendant could have been liable but for the plaintiff's having been made whole, regardless of how the plaintiff was made whole."
719 So.2d at 806. The trial court then declined to apply the $1,500,000 cap, concluding that "§ 6-11-21 [(d)] does not limit this court to considering only the award of compensatory damages by the jury, and in fact the Code section does not mention the term `compensatory damages awarded by the jury' at any point." The trial court found that the Hodgens had proved approximately $1,600,000 in future compensatory damages and because this amount was less than three times the punitive-damages award of $2,250,000, Mobile Infirmary was not entitled to a reduction pursuant to § 6-11-21(d).
The trial court addressed the impact of the abolition of the collateral-source rule [6] by the enactment of § 6-5-545, Ala.Code 1975, as follows:
"It is worth noting that the Court finds that collateral sources played a substantial factor in this case. Since our Alabama Supreme Court has declared that the collateral source rule is now abolished with respect to payments of past and future medical expenses, the jury in this case learned that virtually all of Mr. Hodgen's past and future medical expenses would be covered by Medicare and Blue Cross/Blue Shield. Moreover, given that the pattern jury charge regarding punitive damages, which the Court gave to the jury at least twice, states that punitive damages are `money recovery to the plaintiff by way of punishment to the defendant,' the Court believes that the jury thought it could kill two birds with one stone with its verdict, i.e., award money to the [Hodgens] with a punitive damages award against [Mobile Infirmary] and avoid any collateral source issues. The admissibility of collateral sources, such as Medicare and Blue Cross, may require an adjustment in the pattern jury instructions *816 relating to punitive damages. In any event, the Court was concerned about the jury's punitive damages only verdict and, again, but for defense counsel's statements that the jury's verdict was acceptable, valid, and proper, this Court would have recharged the jury on compensatory damages and nominal damages. For purposes of [Mobile Infirmary's] motion to reduce the verdict from $2.25 million to $1.5 million, the Court finds, for the reasons stated, that [Mobile Infirmary] is not entitled to such reduction."
The trial court upheld the jury's entire $2,250,000 punitive-damages award as its solution to the combined circumstances of (1) the unsettled law as to the effect of the abolition of the collateral-source rule, and (2) Mobile Infirmary's vouching for the validity of the verdict, thus preventing the court from recharging the jury on compensatory damages and nominal damages. We are not insensitive to the need for a just resolution in light of these unique circumstances. However, we opt for a different resolution.
When this Court released Life Insurance Co. of Georgia v. Smith, supra, we had not yet overruled American Legion Post No. 57 v. Leahey, 681 So.2d 1337 (Ala.1996), a case invalidating § 12-21-45, Ala.Code 1975 (a counterpart to § 6-5-545). Consequently, that portion of Smith authorizing the trial court, where a jury has awarded nominal damages, to consider the relationship between the punitive-damages award and the total amount of compensatory damages for which the defendant could have been liable, operated in the context of a pro tanto settlement. Indeed, when § 6-11-21(d) was enacted, Leahey had not yet been overruled. However, since this Court overruled Leahey in Marsh v. Green, 782 So.2d 223 (Ala.2000), the trial court, in considering the total amount of compensatory damages for which the defendant could have been liable in evaluating a punitive-damages award, as set forth in Smith, can consider compensatory damages that could have been awarded but for the abolition of the collateral-source rule.
Mobile Infirmary argues that the rule of Smith dealing with compensatory damages that could have been awarded does not apply here because Smith limits the operation of the rule to instances where nominal damages have been awarded. Because, as we have previously discussed, Mobile Infirmary vouched for the validity of the verdict, we hold that it is not entitled to insist upon such a distinction. As the trial court noted, but for the statement by Mobile Infirmary that the verdict was valid, the jury would have been recharged and a verdict addressing the Hodgens' entitlement to compensatory or nominal damages would have been required.
Mobile Infirmary also contends that the reference to compensatory damages in § 6-11-21(d) is limited to compensatory damages awarded by a jury, thereby precluding consideration of the rule of Smith that a judge, in evaluating a punitive-damages award, can consider compensatory damages that could have been awarded. The bill amending § 6-11-21(d) was enacted into law on June 7, 1999. In determining legislative intent, particularly with reference to the phrase in the statute, "three times the compensatory damages of the party claiming punitive damages," we note the rule established in Abbott Laboratories v. Durrett, 746 So.2d 316 (Ala.1999). In Abbott Laboratories this Court faced a similar circumstance in which it was necessary to take into account the existing state of the law as announced by the United States Supreme Court when interpreting the meaning of a statute enacted by the Legislature dealing with antitrust violations. *817 In Abbott Laboratories, this Court observed:
"[W]hen circumstances surrounding the enactment of laws ... cast doubt on the otherwise clear language of the statutes themselves, we must look to other factors in determining legislative intent. Siegelman [v. Chase Manhattan Bank (USA), N.A., 575 So.2d 1041 (Ala.1991)]. In an effort to avoid indulging in conjecture or searching for imaginary purposes with respect to these antitrust statutes, we have followed the well-settled rule of statutory construction `that it is permissible in ascertaining [the purpose and intent of a statute] to look to the history of the times, the existing order of things, the state of the law when the instrument was adopted, and the conditions necessitating such adoption.' In re Upshaw, 247 Ala. [221,] at 223, 23 So.2d [861,] at 863 [(1945)]."
746 So.2d at 339 (emphasis added).
It is presumed that, when it enacted the amendment to § 6-11-21(d) on June 7, 1999, the Legislature knew that in Smith this Court had discussed in detail the circumstances under which an award of nominal damages would nevertheless permit a substantial award of punitive damages.
Section 6-11-21(d) provides that "no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages." We could effectively amend the statute to conform to the wishes of Mobile Infirmary so that it read as follows: "no award of punitive damages shall exceed three times the compensatory damages awarded to the party claiming punitive damages." (Emphasis added.) But in so doing we would have to attribute the generality of the language "the compensatory damages of the party claiming punitive damages" to sloppy draftsmanship as opposed to the Legislature's cognizance of this Court's recognition in Smith that circumstances may occur under which a substantial punitive-damages award may nonetheless be appropriate when the jury has failed to award significant compensatory damages. Because the Legislature is presumed to be aware of existing law, we decline to attribute the language of the statute to clumsy phraseology.
In Marsh v. Green, we held that § 6-5-545, abrogating the collateral-source rule, was indeed constitutional, and we addressed the significance of practical problems in implementing the will of the Legislature as expressed in that statute. This Court there stated:
"In [American Legion Post No. 57 v.] Leahey, [681 So.2d 1337 (Ala.1996),] this Court criticized § 12-21-45 for, among other things, its `apparent attempt to change the law of evidence without expressing the effect on the law of damages.' 681 So.2d at 1346. This silence can be viewed as a virtue, not a vice, because it leaves to the courts their historical function of determining the limits of recoverable damages, through an evolving common law. This statutory silence gives both a plaintiff and a defendant latitude to explore various arguments about windfalls. A defendant may desire to argue that reimbursement of the plaintiff for medical expenses already paid by an insurer is a double recovery. On the other hand, a plaintiff may wish to argue that the defendant reaps a windfall unless additional damages are awarded, beyond the mere expense of the insurance or other collateral-source benefits, so as to compensate the plaintiff for having the discipline and foresight to devote money or earning power to paying the expense of acquiring the insurance or other collateral-source benefits rather than paying for some immediate gratification. Any review *818 of matters concerning the validity or permissible effect of such arguments must await a proper case. A verdict form dealing specifically with collateral-source reimbursement would facilitate such a review."
782 So.2d at 233 n. 2 (emphasis added).
We are here presented with an opportunity in a proper case to apply the holding of Smith addressing compensatory damages that could have been awarded, in the context of the renewed vitality of § 6-5-545, which abrogates the collateral-source rule. In such situations, a special interrogatory should be propounded to the jury that gives the jury the opportunity to state the amount of compensatory damages it would have awarded, but did not so award because of the evidence of the availability of compensation to the plaintiff from a collateral source. Armed with such information, the trial court can apply the cap set forth in § 6-11-21(d) by determining "the compensatory damages of the party claiming punitive damages."
Mobile Infirmary contends that the finding by the trial court of $1,600,000 in past and future medical expenses is inappropriate because the jury returned a $0 verdict for compensatory damages and because its defense was that there was a lack of causation between the acts of its employees and Hodgen's subsequent complications. Mobile Infirmary's defense throughout trial was that the error in administering the medication did not lead to Hodgen's later complications. We have heretofore recognized the inequity of allowing Mobile Infirmary to capitalize on the fact that the jury entered a verdict awarding no compensatory damages, and we reach the same conclusion here as to the availability of this argument. Nonetheless, we recognize the problem inherent in accepting the trial court's conclusion as to causation as a means of determining, under the rule of Smith, compensatory damages that could have been awarded. We are therefore unwilling to permit the trial court's finding as to $1,600,000 in past and future medical expenses to function as the amount of compensatory damages that could have been awarded for purposes of the rule established in Smith.
Requiring an interrogatory that gives the jury the opportunity to state the amount of compensatory damages that it would have awarded, but did not because evidence was presented that the plaintiff had available compensation from a collateral source, avoids the problems presented by a trial court's making such finding in instances, such as here, where causation is in dispute. [7]
Under the unique circumstances of this case, including the announcement for the first time of the requirement of a special interrogatory to deal with the combined effect of Smith, Marsh v. Green, and § 6-11-21(d), we affirm the judgment of the trial court, on the condition that Hodgen file with this Court, within 14 days of the date of this opinion, a remittitur of the punitive-damages award to $1,500,000, the amount appropriate under § 6-11-21(d), Ala.Code 1975. Otherwise, the trial *819 court's judgment will be reversed and the case remanded for a new trial.
AFFIRMED CONDITIONALLY.[*]
HOUSTON, SEE, BROWN, and STUART, JJ., concur.
LYONS, J., concurs specially.
JOHNSTONE and WOODALL, JJ., concur in part and dissent in part.
HARWOOD, J., concurs in part, dissents in part, and dissents from the judgment.
LYONS, Justice (concurring specially).
I concur in Parts II, III, IV, and V of the majority opinion. I concur specially as to Part I, and I write to deal further with the finding of invited error.
In concurring specially in Part I, I note that Justice Almon, in his dissenting opinion in Life Insurance Co. of Georgia v. Smith, 719 So.2d 797, 814-15 (Ala.1998), observed that "when the jury returned its verdicts awarding $0 compensatory damages and $200,000 punitive damages for each plaintiff, the court asked if there were `any matters that we need to address for the record,' and the defendants' attorney answered `No.'" Based on that response, Justice Almon stated that he would have held that "by failing to object before the jury was dismissed, the defendants waived any error in the form of the verdict." 719 So.2d at 815. Here, when the verdict was returned awarding $0 in compensatory damages but awarding $2,250,000 in punitive damages, the trial court stated that it thought that it was a good verdict in spite of the absence of an award of compensatory damages; counsel for Mobile Infirmary stated, "I do too." Such affirmative representation in the case before us as to the validity of the verdict goes much further than the trial court's general inquiry in Smith as to "any matters that we need to address for the record." Further, in Smith this Court was reluctant to penalize the plaintiff "for her failure to require either a verdict for compensatory damages or a verdict for nominal damages as a prerequisite to an award of punitive damages" because such a holding "would be an unfair departure from the recent trend of the precedents." 719 So.2d at 807. Given an unwillingness on the part of the main opinion in Smith to hold the plaintiffs to the consequences of a procedural default, it is not surprising that the main opinion rejected the proposition advanced in Justice Almon's dissenting opinion that the defendant should be held to a waiver. Here, no basis exists for confusion as to the state of the law and Mobile Infirmary's vouching for the verdict stands on different footing. Consequently, I agree with the main opinion's conclusion that the trial court did not err in denying Mobile Infirmary's postjudgment motion for a JML based on the failure of the jury to award compensatory or nominal damages.
JOHNSTONE, Justice (concurring in part and dissenting in part).
I concur in Parts I, II, III, and IV of the main opinion. I respectfully dissent from Part V and from the judgment of this Court alternatively imposing the lesser alternative of the punitive damage cap or granting a new trial to the defendant.
The trial court correctly applied the law of Life Insurance Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998), to the facts of this case. The defendant, by agreeing that the jury could return its punitive damage award in conjunction with its zero compensatory damage award, waived any right to *820 a jury quantification of the plaintiff's compensatory damages. The defendant could not deny before the trial court and cannot deny before us that the plaintiff suffered calamitous damages due compensation. The zero compensatory award cannot be attributed otherwise than to the proof of the collateral sources of compensation.
WOODALL, Justice (concurring in part and dissenting in part).
I concur in Parts I, II, III, and IV of the main opinion. However, I respectfully dissent from Part V and from the judgment of this Court, because I would affirm the judgment of the trial court unconditionally.
I agree with Justice Johnstone, when he states:
"The trial court correctly applied the law of Life Insurance Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998), to the facts of this case. The defendant, by agreeing that the jury could return its punitive damage award in conjunction with its zero compensatory damage award, waived any right to a jury quantification of the plaintiff's compensatory damages."
884 So.2d at 819-20.
Today, this Court holds "a special interrogatory should be propounded to the jury that gives the jury the opportunity to state the amount of compensatory damages it would have awarded, but did not so award because of the evidence of the availability of compensation to the plaintiff from a collateral source." 884 So.2d at 818. I cannot reverse the judgment of the trial court, if Hodgen does not accept the remittitur, where Mobile Infirmary never requested any such interrogatory and never argues on appeal that any such interrogatory should have been propounded. Having rejected the arguments actually made by Mobile Infirmary, this Court should simply affirm the judgment of the trial court.
HARWOOD, Justice (concurring in part, dissenting in part, and dissenting from the judgment).
I concur in Parts I, II, III, and IV of the main opinion, but respectfully dissent from Part V and the judgment. In that latter regard, I agree with the observations and rationales expressed by Justices Johnstone and Woodall in their respective dissents. I write further to comment as follows:
Following the adverse verdict, Mobile Infirmary filed its initial "Motion for Judgment Notwithstanding the Verdict,[[8]] or Alternatively and Without Waiver, Motion to Enforce Applicable Statutory Limits of Liability." Consistent with that caption, the only relief sought was either a reversal of the judgment entered on the verdict and a judgment rendered for Mobile Infirmary, or a reduction of the punitive-damages award pursuant to either § 6-5-544(b) or § 6-11-21, Ala.Code 1975. Mobile Infirmary eschewed any relief by way of a new trial. At the hearing conducted on its motion, the trial judge broached the idea of granting a new trial, but defense counsel opted to forgo that option, stating that there was no need for a new trial because of counsel's certainty that the trial court's judgment should be reversed and a judgment rendered for Mobile Infirmary. The trial judge specifically advised counsel, "I've got a week August the 26 and I can set it down right now." Both counsel for Hodgen and counsel for Mobile Infirmary rejected that offer, each expressing confidence in, respectively, sustaining the verdict on appeal or obtaining a reversal of the judgment and the rendering of a verdict for Mobile Infirmary. At a later point *821 in the hearing, addressing Mobile Infirmary's counsel, the court stated, "but once more I'll say if you want a new trial; you don't, right?" to which counsel replied, "Correct." The trial judge kept the option open, however, by stating immediately thereafter, "if you want a new trial and you feel uncertain, we'll do it August 26, the week thereof."
In its briefs filed with this Court, Mobile Infirmary likewise urges only that the judgment be reversed and a judgment rendered in its favor, or that there be a remittitur of the verdict.
In the parts of the opinion preceding Part V, this Court denies all the relief sought by Mobile Infirmary. The opinion then proceeds to state that in cases involving the need to ascertain the amount of compensatory damages that could have been awarded, even though not specified in the verdict, in the context of the admissibility of collateral-source evidence pursuant to § 6-5-545, Ala.Code 1975, "a special interrogatory should be propounded to the jury...." This special interrogatory would be in addition to "the form of verdict" required by Life Insurance Co. of Georgia v. Smith, 719 So.2d 797, 807 (Ala.1998), which "provide[s] the jury with the opportunity to answer an interrogatory...." An appropriate "example" of the form of verdict that would accomplish that purpose is set out in Smith as follows:
"FORM OF VERDICT
"Verdict for the Plaintiff

"1. Check One:
"( ) We find that the plaintiff is entitled to compensatory damages in the amount of $______. (Here fix an amount other than zero).3
"( ) We find that the plaintiff is entitled to recover nominal damages only.
"2. Check One:
"( ) We find that the plaintiff is not entitled to recover punitive damages.
"( ) We find that the plaintiff is entitled to recover punitive damages in the amount of $______.
"Verdict for the Defendant

"( ) We find the issues in favor of the defendant.
______
"3If the plaintiff previously has been made whole for harm or damage for which the defendant otherwise would have been liable, such as through a pro tanto settlement or a tender not part of an offer of compromise, thereby making an award of compensatory damages inappropriate, this option should be omitted from the form."
719 So.2d at 807.
The statements in Smith that such a verdict form would be required in a case where only nominal damages were appropriate are contained in the part of that opinion designated as "III. The Alleged Inconsistency in the Jury Verdict." Only four Justices concurred in the full opinion, two concurred in the result, and none of the three dissenting Justices concurred as to Part III. Thus, Part III of that opinion had no precedential value, before today. Presumably the "special interrogatory" the main opinion mandates in the context of cases where collateral-source evidence is presented to the jury pursuant to either § 6-5-545 or § 12-21-45, Ala.Code 1975, could appropriately be inserted in the verdict form as follows:
"FORM OF VERDICT
"Verdict for the Plaintiff

"1. Check One:
"( ) We find that the plaintiff is entitled to compensatory damages in the amount *822 of $______. (Here fix an amount other than zero).3
"( ) We find that the plaintiff is entitled to recover nominal damages only.
"( ) Although we award only nominal damages, we do so because that plaintiff's medical or hospital expenses have been or will be paid or reimbursed; but for that evidence, we would have awarded compensatory damages in the amount of $______.
"2. Check One:
"( ) We find that the plaintiff is not entitled to recover punitive damages.
"( ) We find that the plaintiff is entitled to recover punitive damages in the amount of $______.
"Verdict for the Defendant

"( ) We find the issues in favor of the defendant.
______
"3If the plaintiff previously has been made whole for harm or damage for which the defendant otherwise would have been liable, such as through a pro tanto settlement or a tender not part of an offer of compromise, thereby making an award of compensatory damages inappropriate, this option should be omitted from the form."
(Emphasis on suggested addition to form.)
If this complete set of options is presented to a jury, accompanied by appropriate explanatory instructions, entry in the compensatory-damages blank of "$ 0," rather than a finding of nominal damages, presumably will preclude the plaintiff from recovering any punitive damages. Should a verdict be returned indicating "$ 0" compensatory damages but awarding punitive damages, the trial judge should have the option of rejecting the two verdicts as inconsistent and returning the jury for further deliberations based upon additional instructions explaining the inconsistency and possible consistent options. If that course of action were not to be taken before the jury was discharged and released, the trial judge presumably would be obliged to grant a new trial, either on its own motion or upon motion of the aggrieved party.
Given the particular procedural posture of this case, as it relates to defense counsel's agreement with the trial judge's expressed opinion that the award of "$ 0" compensatory damages, but $2,250,000 punitive damages was, although, "an odd verdict," nonetheless "a good verdict" and defense counsel's statement that "I think they [i.e., the jury] can do it," and Mobile Infirmary's election not to seek, and even to decline the trial judge's offer of, a new trial, I would simply affirm.
NOTES
[1] Evidence at trial indicated that sometime after Byrd administered the overdose, Byrd and Mobile Infirmary learned that Byrd had failed her nursing board examination.
[2] Mobile Infirmary's motion was styled as a "motion for a judgment notwithstanding the verdict." Under Rule 50, Ala. R. Civ. P., the "motion for a judgment notwithstanding the verdict" has been renamed a "renewed motion for a judgment as a matter of law." See Lyons v. Walker Reg'l Med. Ctr., 868 So.2d 1071, 1076 n. 1 (Ala.2003). We will use that terminology in this opinion.
[3] Cocounsel for Mobile Infirmary admitted that he had nodded his head affirmatively in response to the trial court's question whether the jury could make such an award.
[4] In support of its argument that it properly raised the issue of the appropriateness of the verdict awarding only punitive damages in its renewed motion for a JML, Mobile Infirmary cites Life Insurance Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998), and Barnes v. Oswalt, 579 So.2d 1319 (Ala.1991). However, neither Smith nor Barnes involved invited error; in fact, footnote one of Barnes specifically states: "A third issue raised by the parties is whether Barnes led the trial court into error. Because we reverse on other grounds, we do not address this issue." Barnes, 579 So.2d at 1320, n. 1. Thus, the holdings in Smith and Barnes are not controlling as to this issue.
[5] Mobile Infirmary also makes several arguments concerning the trial court's ruling on various evidentiary matters relating to Hodgen's claim of wanton training and supervision. Because of our disposition of Hodgen's claim that Mobile Infirmary was wanton in administering the digoxin, it is unnecessary to reach those arguments.
[6] In Marsh v. Green, 782 So.2d 223 (Ala.2000), this Court embraced the following definition of the collateral-source rule:

"`Thus, the courts generally have held that benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer. This is known as the "collateral source rule." Under it, the wrongdoer cannot take advantage of the contracts or other relation that may exist between the injured person and third persons. Thus, while a plaintiff's recovery under the ordinary negligence rule is limited to damages which will make him whole, the collateral source rule allows a plaintiff further recovery under certain circumstances even though he has suffered no loss.'"
782 So.2d at 230 (quoting 22 Am.Jur.2d Damages § 566 (1988) (citations omitted)).
[7] Those problems are not presented where the defendant's diminished exposure to an award of compensatory damages results from a pro tanto settlement, because the issues as to the amount of the settlement and causation are not in dispute. The dissenting opinions of Justice Johnstone and Justice Woodall apparently do not accept the distinction between the ease of calculation of the amounts involved in pro tanto releases, as discussed in Smith, and the effect of damages not awarded by reason of the abrogation of the collateral-source rule when issues as to causation are presented. Having accepted the argument of Mobile Infirmary as to an existence of a jury question on the issue of causation it would be inappropriate to affirm the judgment as Justice Woodall urges in his dissenting opinion.
[*] Note from the reporter of decisions: The Supreme Court's docket sheet indicates that on November 12, 2003, the appellee filed an acceptance of the remittitur.
[8] See note 2.