981 So.2d 1077 (2007)
MOBILE INFIRMARY ASSOCIATION
v.
Robert E. TYLER, as administrator of the estate of Lida Mae Tyler, deceased.
1041484.
Supreme Court of Alabama.
September 14, 2007.
*1079 Michael E. Wright, Robert P. MacKenzie III, and William T. Johnson III of Starnes & Atchison, LLP, Birmingham; and W. Christian Hines III of Starnes & Atchison, LLP, Mobile, for appellant.
George W. Finkbohner III, David S. Cain, Jr., David G. Wirtes, Jr., and George M. Dent III of Cunningham, Bounds, Crowder, Brown & Breedlove, LLC, Mobile, for appellee.
SMITH, Justice.
Mobile Infirmary Association ("the Infirmary") appeals from a judgment, entered on a jury verdict, in favor of Robert E. Tyler, as administrator of the estate of his mother, Lida Mae Tyler, deceased. We affirm conditionally.

Facts and Procedural History
On Friday, June 4, 1999, Lida Mae Tyler, who was 72 years old, complained to her daughter-in-law, Teresa Tyler, that she felt dizzy and tired and that her heart felt like it was "racing." Teresa took Lida to the office of Dr. Steven Donald in Chatom. Dr. Donald examined Lida and concluded she was suffering from a heart arrhythmia called atrial fibrillation,[1] and *1080 he advised her to go to the Infirmary, where she could be examined by a cardiologist.
Dr. Mir Wail Hashimi, a cardiologist employed by Cardiology Associates of Mobile, P.C. ("CAM"), examined Lida in the emergency room of the Infirmary. Lida explained that she was experiencing what the record describes as "intermittent epigastric" and chest pains as well as indigestion. Although a number of tests were performed on Lida, Dr. Hashimi could not determine the cause of her atrial fibrillation. However, he did determine that she had not suffered a heart attack.[2] Dr. Hashimi prescribed Cardizem to lower Lida's blood pressure, and he admitted Lida to the Infirmary for observation in the cardiac-care unit.
Dr. Hashimi recommended that Lida undergo a "cardioversion" procedure, which would electronically convert her heart rhythm from atrial fibrillation to a normal rhythm. However, Dr. Hashimi told Lida that she would need to take blood-thinning medication for approximately 30 days before undergoing the procedure.[3] Dr. Hashimi told Lida and Robert that he intended to keep her in the hospital for a couple of days to monitor her condition and to start her on blood-thinning medication.
Dr. Hashimi examined Lida at about 8:30 a.m. on Saturday, June 5, 1999; Lida informed Dr. Hashimi that she was "feeling pretty good." After Dr. Hashimi left, Robert remained in the room with his mother until lunchtime. From 7:00 a.m. until approximately 1:00 p.m., Lida's condition was normal, and she did not complain of pain.
Dr. Hashimi went "off call" at approximately 1:00 p.m., and another cardiologist employed by CAM, Dr. J. Brian DeVille, took over Dr. Hashimi's patients, including Lida. Also at 1:00 p.m., registered nurse Michelle Swearingen began her shift as a "triage nurse" for CAM, which she performed from her house. Nurse Swearingen's responsibilities included handling patient and physician inquiries forwarded to her from CAM's weekend answering service.
As Nurse Swearingen began her shift on Saturday at 1:00 p.m., registered nurse Amy Greene was approximately halfway through her 12-hour shift in the Infirmary's cardiac-care unit, where she was caring for Lida. In accordance with Dr. Hashimi's orders, Nurse Greene had weaned Lida off intravenous Cardizem and had begun giving her Cardizem in pill form. Nurse Greene also was administering intravenous heparin, a blood-thinning medication, to Lida.
According to Lida's medical records, at approximately noon her heart rhythm *1081 spontaneously converted from atrial fibrillation to a normal rhythm; her heart rate at that time was 88, and her blood pressure was 132/71. However, between 1:15 p.m. and 1:35 p.m., Lida's heart rhythm again went into atrial fibrillation, and Nurse Greene's "focus note" in the hospital records indicates that Lida complained at 1:30 p.m. that she had begun experiencing abdominal pain that was the "worst she'[d] ever had."[4] At about the same time, Lida's heart rate increased to 160, and her blood pressure went up to 170/86.
Robert returned to the hospital at about the time Lida began to complain of abdominal pain, and he immediately asked Nurse Greene for help and asked her to call for a doctor. Consistent with orders Dr. Hashimi had given when Lida was admitted to the Infirmary on Friday, Nurse Greene administered Darvocet and Phenergan to Lida for her abdominal pain. Nurse Greene also examined Lida's abdomen and determined that it appeared to be normal, despite her complaints of severe pain. Robert and Lida, however, asked to see a physician.
At 1:40 p.m., Nurse Greene placed the first of three telephone calls to CAM to report Lida's complaints.[5] The answering service for CAM answered the call, and the service then telephoned Nurse Swearingen, who, in turn, telephoned Nurse Greene at the Infirmary.
Nurse Swearingen testified that she understood Nurse Greene's "primary concern[s]" in their first conversation to be Lida's "atrial fib with the increased heart rate and [her] elevated blood pressure."[6] Nurse Swearingen testified that she did not understand from Nurse Greene that Lida's situation was any type of an emergency. At the conclusion of their conversation, Nurse Swearingen told Nurse Green to restart Lida's intravenous Cardizem and to give her an additional five-milligram dose or "bolus" of Cardizem.
Nurse Swearingen then telephoned Dr. DeVille. She relayed to Dr. DeVille that *1082 Dr. Hashimi had admitted Lida on Friday and that Lida continued to experience atrial fibrillation even though Lida's heartbeat had spontaneously converted from atrial fibrillation to a normal rhythm for a period of time on Saturday morning. Nurse Swearingen testified that she also told Dr. Deville that Lida was taking heparin, Coumadin, and Cardizem and that Lida was having episodes of abdominal pain even though her abdominal examination had revealed nothing out of the ordinary. Dr. DeVille approved the order given by Nurse Swearingen to Nurse Greene to restart Lida's intravenous Cardizem and to administer a five-milligram bolus of Cardizem.
At approximately 2:00 p.m., Lida continued to complain of nausea and stomach pain. Robert again relayed the complaints to Nurse Greene, and he again asked her to request that a physician examine Lida.[7] Nurse Greene placed a second call to CAM; again, the answering service relayed a message to Nurse Swearingen, and she telephoned Nurse Greene at the Infirmary.
In their second conversation, Nurse Greene told Nurse Swearingen that Lida was still in atrial fibrillation, that her blood pressure was at 190/90 to 200/100, and that her heart rate was varying between 110 and the 160s. Nurse Greene also stated that Lida was still complaining of nausea and of abdominal pain that was "worse than usual." Nurse Greene also stated that the family wanted to speak with a doctor; however, Nurse Swearingen testified that Nurse Greene did not present Lida's situation as an emergency.
Nurse Swearingen testified at trial that she then telephoned Dr. DeVille and informed him that Lida's heart rate and blood pressure remained elevated, that she was having abdominal pain and nausea, that the abdominal pain was "worse than usual," and "that the family had requested to see a physician, talk to a physician." The evidence is somewhat conflicting regarding Dr. DeVille's response at that point: Nurse Swearingen testified that Dr. DeVille did not tell her to make any changes at that time, but Dr. DeVille testified that in either the second or third telephone call, he told Nurse Swearingen to order Nurse Greene to give Lida an additional 15-milligram bolus of Cardizem and to increase the infusion rate of the intravenous Cardizem.
At approximately 2:27 p.m., a third call was placed to CAM. Nurse Greene reported to Nurse Swearingen that Lida's vital signs had not returned to normal and that her nausea and stomach pain persisted. Nurse Swearingen again contacted Dr. DeVille. She told him that Lida's heart rate and blood pressure remained elevated, that she was still in atrial fibrillation, and that she continued to experience abdominal pain and nausea.
Dr. DeVille told Nurse Swearingen to order Nurse Greene to apply nitroglycerin paste to Lida's chest, and Dr. DeVille ordered another 15-milligram bolus of Cardizem for Lida. Dr. DeVille also requested Nurse Swearingen to consult Dr. S. Cyle Ferguson, a gastroenterologist, about Lida's abdominal pain; the consultation order, however, was not a "stat" or emergency order. Nurse Swearingen relayed Dr. DeVille's orders to Nurse Greene.
Nurse Greene put in a request for the consult with Dr. Ferguson. At approximately *1083 4:00 p.m. Nurse Swearingen telephoned the Infirmary and spoke with Nurse Patti Elrod to determine the status of the gastrointestinal consult. Nurse Elrod confirmed that a consult had been ordered and that Dr. DeVille's other orders had been carried out. Nurse Elrod also told Nurse Swearingen, erroneously, that the gastroenterologist consult had been completed.
For the remainder of the afternoon, Lida rested, and her blood pressure and heart rate dropped from their earlier elevated levels. However, she continued to experience abdominal pain.
At approximately 6:30 p.m., registered nurse Jason Lundy, who was employed by the Infirmary, began to take over Lida's care. At about the same time, Dr. C. Ivey Williamson, a gastroenterologist and Dr. Ferguson's partner, visited the Infirmary to perform the consultation Dr. DeVille had requested. Dr. Williamson performed the consultation because Dr. Ferguson was not on call.
Lida told Dr. Williamson that her abdominal pain earlier in the day was "more severe than she usually had." Dr. Williamson recorded that her bowel sounds were active and that her abdomen was slightly tender. He concluded that her pain as described by Lida was out of proportion to his physical findings, and he thought that Lida probably was suffering from peptic-ulcer disease or pancreatitis. Dr. Williamson recommended that Lida undergo an ultrasound of her gallbladder the next morning.
Nurse Lundy continued to monitor Lida, and he telephoned CAM for authorization to run the tests Dr. Williamson had ordered. Dr. DeVille returned Nurse Lundy's call and authorized the tests.
On the morning of Sunday, June 6, Nurse Greene began another shift and assumed Lida's care. Lida's condition had worsened. Nurse Greene observed that Lida was, according to Nurse Greene's testimony, "moaning" and "only responsive to pain." Nurse Greene also noted that Lida's abdomen was distended and hard. Nurse Greene placed Lida in the Infirmary's intensive-care unit. After Dr. Hashimi examined Lida, he telephoned Dr. Gerhard Boehm, a surgeon. Dr. Boehm concluded that Lida needed emergency surgery.
Dr. Boehm's surgery revealed that Lida's intestine was necrotic and that she was suffering from an infection. Dr. Boehm determined that the necrosis was caused by a mesenteric blood clot. He concluded that her condition was fatal, and he recommended that her family authorize the hospital to forgo resuscitation efforts. Lida died on Monday, June 7, 1999.
On July 12, 2000, Robert, as administrator of Lida's estate, filed a complaint in the Mobile Circuit Court against Dr. Hashimi, Dr. DeVille, Nurse Swearingen, CAM, Dr. Williamson, Dr. Ferguson, Internal Medicine Center, L.L.C. ("IMC"),[8] and the Infirmary.[9] The complaint alleged claims of wrongful death and medical malpractice.
Before trial, summary judgments were entered in favor of Dr. Ferguson and Nurse Swearingen. Robert's action eventually proceeded to trial against Dr. Hashimi, Dr. DeVille, CAM, Dr. Williamson's *1084 estate,[10] IMC, and the Infirmary. At the close of Robert's case-in-chief, all the defendants filed motions for a judgment as a matter of law ("JML"). The trial court granted the motions of Dr. Hashimi, Dr. Williamson's estate, and IMC but denied the motions filed by Dr. DeVille and CAM. The trial court granted in part and denied in part the Infirmary's motion for a JML.[11] At the close of the defendants' cases-in-chief, the remaining defendants filed motions for a JML, which the trial court denied.
The jury then returned a verdict against solely the Infirmary for $5,500,000 in damages. The trial court denied all postjudgment motions filed by the Infirmary, and the Infirmary timely filed a notice of appeal.

Discussion

I.
The parties agree that certain provisions of the Alabama Medical Liability Act, § 6-5-480 et seq., Ala.Code 1975, as supplemented by the Alabama Medical Liability Act of 1987, § 6-5-540 et seq., Ala.Code 1975 ("the Act"), apply to this case. Any liability on the part of the Infirmary is derived from the actions of its nurses; therefore, under § 6-5-548(a) of the Act, Robert had "the burden of proving by substantial evidence that the health care provider [i.e., the Infirmary's nurses] failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case."
The Infirmary argues first that the trial court should have granted the Infirmary's motions for a JML or, alternatively, its motion for a new trial, because, the Infirmary contends, there was not sufficient evidence to support Robert's claim that the Infirmary's nurses breached an applicable standard of care. The Infirmary also contends that Robert failed to offer sufficient evidence of causation.
The standard of review applicable to a ruling on a motion for a JML was stated in Mobile Infirmary Medical Center v. Hodgen, 884 So.2d 801, 808-09 (Ala.2003):
"Our standard of review for a renewed motion for a JML is well settled:
"`In reviewing the trial court's ruling on a motion for a JML, an appellate court uses the same standard the trial court used in ruling on the motion initially. Thus, "`we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.'" Acceptance Ins. Co. v. Brown, 832 So.2d 1, 12 (Ala.2001), quoting American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala.1993); see, also, *1085 Jim Walter Homes, Inc. v. Kendrick, 810 So.2d 645, 649-50 (Ala.2001).'
"Hicks v. Dunn, 819 So.2d 22, 23-24 (Ala.2001). Thus, in reviewing the evidence in this case, we are required to construe the facts and any reasonable inferences that the jury could have drawn from them most favorably to [the nonmovant]."
Moreover, this Court noted in Liberty Life Insurance Co. v. Daugherty, 840 So.2d 152, 156 (Ala.2002):
"`"A judgment as a matter of law is proper only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ and the moving party is entitled to a judgment as a matter of law."' Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 510-11 (Ala. 2000), quoting Locklear Dodge City, Inc. v. Kimbrell, 703 So.2d 303, 304 (Ala. 1997). In reviewing the denial of a motion for a judgment as a matter of law, this Court is required to view the evidence in a light most favorable to the nonmovant. Kmart Corp. v. Kyles, 723 So.2d 572, 573 (Ala.1998). Therefore, where the evidence in the record is disputed, we present it in a light most favorable to [the nonmovant]."
Our standard for reviewing a trial court's ruling on a motion for a new trial has been stated as follows:
"There is a strong presumption that a trial court's ruling on a motion for a new trial is correct. Alabama Dep't of Transp. v. Land Energy, Ltd., 886 So.2d 787, 792 (Ala.2004). The trial court's ruling on a motion for new trial `"should not be disturbed on appeal unless the record plainly and palpably shows that the trial court erred and that some legal right has been abused."' 886 So.2d at 792 (quoting McBride v. Sheppard, 624 So.2d 1069, 1070-71 (Ala.1993)). However, we review a ruling on a question of law de novo. Ex parte Forrester, 914 So.2d 855, 858 (Ala.2005)."
Parker Bldg. Servs. Co. v. Lightsey, 925 So.2d 927, 930 (Ala.2005).

A.
The Infirmary contends that Karen Cepero, a registered nurse who testified during Robert's case-in-chief, was not qualified as a "similarly situated health care provider" under § 6-5-548(b), Ala. Code 1975, to testify against the Infirmary's nurses, particularly against Nurse Greene.
At trial, Robert focused primarily on the actions of Nurse Greene, who, at the time she provided care to Lida, was a registered nurse providing hands-on patient care in the Infirmary's cardiac-care unit. Therefore, Robert was required to offer substantial evidence showing that Nurse Greene's actions fell below the standard of care stated in § 6-5-548(a).
To meet that burden, Robert had to offer testimony from "a `similarly situated health care provider'" in conformity with § 6-5-548(b), Ala.Code 1975, which provides:
"(b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a `similarly situated health care provider' is one who meets all of the following qualifications:
"(1) Is licensed by the appropriate regulatory board or agency of this or some other state.

*1086 "(2) Is trained and experienced in the same discipline or school of practice.
"(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred."
The Infirmary's principal objection to Nurse Cepero's qualifications is whether she meets the requirement stated in § 6-5-548(b)(3). Thus, the Infirmary argues that "there was no affirmative showing by [Robert] that Nurse Cepero provided `hands on care' to any patient in the telemetry units for which she had responsibility in the year preceding 1999." (Infirmary's brief, p. 23.)
In response, Robert contends that the Infirmary failed to object to Nurse Cepero's qualifications at the time Robert introduced Nurse Cepero's testimony at trial; therefore, Robert argues, the Infirmary waived any objection to her qualifications.[12] We agree.
The Infirmary filed a pretrial motion objecting to the qualifications of Nurse Cepero, and, at the close of Robert's case, filed a motion for a JML that, among other things, objected to Nurse Cepero's qualifications. However, the Infirmary did not object to Nurse Cepero's qualifications at the time Robert sought to introduce her testimony into evidence at the trial.[13] Consequently, the Infirmary did not raise a timely objection to the qualifications of Nurse Cepero as a similarly situated health-care provider.
"`An objection must be made and a ground stated therefor or the objection and error are deemed to have been waived.' Costarides v. Miller, 374 So.2d 1335, 1337 (Ala.1979). See also HealthTrust, Inc. v. Cantrell, 689 So.2d 822, 825-26 (Ala.1997). `Objections must be "raised at the point during trial when the offering of improper evidence is clear," see Charles W. Gamble, McElroy's Alabama Evidence § 426.01(3) (5th ed. 1996).' HealthTrust, 689 So.2d at 826. Dr. Vaughan and the Group did not challenge Dr. Rodan's qualifications as a similarly situated health-care provider until the close of the plaintiff's evidence. Consequently, their challenge was untimely and was waived. HealthTrust, supra, and Paragon Eng'g, Inc. v. Rhodes, 451 So.2d 274, 277 (Ala. 1984)."
Vaughan v. Oliver, 822 So.2d 1163, 1169 (Ala.2001).

B.
In response to the Infirmary's contention that there was not sufficient evidence to support the conclusion that the Infirmary's nurses negligently breached an applicable standard of care, Robert argues, among other things, that there was sufficient evidence from which the jury could conclude that Nurse Greene negligently failed to adequately and accurately communicate to CAM the nature and severity of Lida's abdominal pain. We agree.
At trial, Robert testified as follows:
"Well, when I got back [to the Infirmary on June 5], I'm guessing it was around 1:00 o'clock, possibly 1:30, somewhere thereabouts, when I walked in the *1087 door, [Lida] was screaming in pain. When I say screaming, she was, `Oh, [Robert], help me. Oh, I'm hurting.' She was sitting up in bed. And as best I can remember, it was [Nurse Greene] in there with her at the time.
". . . .
"[Lida] was sitting up in bed. And I can't remember for sure if her legs were off the bed or over the foot of the bed or what. She was sitting up in bed screaming, `[Robert], help me. Oh, I'm hurting. Oh, oh, I'm hurting,' just like that, you know, nothing near about any kind of ordinary pain that you have in your abdomen."
Robert's testimony was corroborated by testimony from Teresa and from Robert and Teresa's adult son, Todd.[14]
In addition, Nurse Greene had prepared "focus notes" that documented her experience in caring for Lida; those notes were admitted into evidence as a part of Lida's records from the Infirmary. Those notes and testimony regarding them at trial indicate that Nurse Greene had written that at 1:30 p.m. on June 5, Lida reported experiencing the worst abdominal pain she had ever had.[15]
Nurse Swearingen testified that Nurse Greene told her Lida was experiencing *1088 abdominal pain. However, Nurse Swearingen testified that Nurse Greene did not tell her that Lida described the pain as the worst abdominal pain she had ever experienced. Instead, Nurse Swearingen testified that Nurse Greene told her that Lida had a history of abdominal pain and that Nurse Greene stated, during one of their telephone conversations, that Lida described her pain as "worse than usual." Nurse Swearingen stated that in their telephone conversations, Nurse Greene's focus was on Lida's atrial fibrillation and her rapid ventricular response.
Specifically, Nurse Swearingen testified as follows:
"Q. Tell us about the [first] conversation you had with Nurse Greene; what did she tell you?
"A. Okay. She told me she had a patient, Mrs. Lida Tyler, who was on telemetry and who had been admitted the day before with rapid atrial fib. She had converted to sinus rhythm that morning and that afternoon she had gone back into atrial fib with elevated heart rate and elevated blood pressure.
"She told me that she had weaned the  she had taken her off of the IV Cardizem she had been on since Friday, earlier that morning. We talked about her medications. She told me that she was on the pill form of Cardizem. . . . She had weaned the IV Cardizem earlier. And Heparin. She was on IV Heparin. She told me she was having nausea and abdominal pain. And she had given Phenergan and Darvocet and Milk of Magnesia earlier that afternoon.
"Q. Now, from your discussion with Nurse Greene, what did you understand the purpose of this first call to be?
"A. The atrial fib with the increased heart rate and elevated blood pressure was her primary concern.
"Q. Was this being  was it being presented to you as any type of emergency?
"A. No.
". . . .
"Q. Now, in regard to Mrs. Tyler's pain, you were told  what were you told about her abdominal pain?
"A. I asked [Nurse Greene] if Mrs. Tyler had had a history of abdominal pain and she said she didn't know. And I asked her if there was any family with her that could answer that or if Mrs. Tyler could answer that and she put me on hold and she went and talked to someone. And I actually could hear them in the background. It was a male. I couldn't hear the words he said. But when she came back, she said that Mrs. Tyler did have a history of abdominal pain.
"Q. Okay. Did that occur in the first call or the second call?
"A. That was in the first phone call.
"Q. Now, were you told whether or not she had  in regard to the abdominal assessment, you were told there were positive bowel sounds?
"A. Right. We talked about the abdominal assessment and she told me that she had bowel sounds in all four quadrants and that her abdomen was nontender. It was nondistended.
". . . .
"Q. Now, what did you do at that point? After you got that information, what did you do?
"A. I called Dr. Deville . . . [and] told [him] that there was a patient, Lida Tyler, who was admitted to Mobile Infirmary on Friday. She had had a normal heart cath. And she had been admitted primarily for a rapid atrial fib, which she had gone into sinus rhythm Saturday morning. She had been on IV Cardizem; *1089 it was weaned. She was back in atrial fib with a rapid rate. She had elevated blood pressure. Elevated heart rate.
"We went over her medications. I told him she was on Heparin and Coumadin and PO Cardizem. And we talked about her exam, her abdominal exam, her peripheral exam and that I had given [Nurse Greene] instructions to give a Cardizem bolus and restart the Cardizem and that she had had a history of abdominal pain.
"Q. Did you tell him about the abdominal assessment that [Nurse] Greene had done?
"A. Yes.
"Q. That is her abdominal assessment showed positive bowel sounds in all four quadrants, soft, nontender, nondistended?
"A. Right.
"Q. And you told him that you had been informed that she had a history of the same abdominal pain?
"A. I did.
". . . .
"Q. What did [Nurse] Greene tell you on the second call?
"A. [Nurse Greene] told me that [Lida's] blood pressure was still elevated. Her heart rate was still elevated. Still in atrial fib. And she was having nausea and abdominal pain. We talked about the nausea and abdominal pain. She told me that it was worse than usual, is how [Lida] stated it, not how [Nurse Greene] stated it. [Lida] had expressed that her abdominal pain was worse than usual.
"Q. Were there any other descriptions that you were given?
"A. Yes. She told me that [Lida's] family had asked to speak to a physician.
". . . .
"Q. Were you ever told by anyone from Mobile Infirmary and these calls from [Nurse] Greene that Mrs. Tyler was in the worst pain she had ever had?
"A. I was not told that.
"Q. Would that have been important for you to know?
"A. I would like to know everything the nurse has to offer so I can tell the doctor. Any information, yes, sir, would be helpful.
"Q. And if, in reality, this was not the same type of indigestion she had had at home, but instead this was the most severe abdominal pain that bent her over at about 1:00, and that she was begging for help and wanted the doctor, and that her son had demanded the doctor, that's not the picture that was painted to you, is it?
"A. No, sir.
". . . .
"Q. What, if anything, would you have done differently, given those additional facts?
"A. I wouldn't have done anything differently. I would have taken the facts and given them to Dr. Deville, just like I did.
"Q. So the only thing that would have been different is you would have given him more information, information you did not otherwise have; is that correct?
"A. Different information.
". . . .
"Q. Now, it's true that in at least two of these phone conversations that [Nurse] Greene sounded anxious, according to your testimony at your deposition?
". . . .
"A. When [Nurse Greene] called me, she sounded anxious about the atrial fib *1090 and the elevated heart rate and the elevated blood pressure. That is what was communicated to me that her anxiety was about the rhythm and the rate.
". . . .
"Q. You had no indication in any of these phone conversations that Mrs. Tyler had been doubled over in pain, abdominal pain, and that her family was demanding a doctor?
"A. No, sir, I had no indication of that."
Thus, Nurse Swearingen's testimony was sufficient evidence from which the jury could conclude that Nurse Greene did not communicate to Nurse Swearingen that Lida stated that she was experiencing the worst pain she had ever had.
Robert presented testimony from Nurse Cepero, a similarly situated health-care provider, that Nurse Greene breached the applicable standard of care if Nurse Greene failed to communicate to Nurse Swearingen that Lida was experiencing the worst abdominal pain she had ever had. Specifically, Nurse Cepero testified in deposition:
"`Q. If Nurse Greene in the phone conversation she had with Nurse Swearingen on June 5, 1999, in the afternoon, had not . . . reported that Lida Tyler had a sudden acute onset of the worst stomach pain she ever had in her life, and that it occurred soon after spontaneous cardioversion, and instead of communicating that, Nurse Greene told Nurse Swearingen that Mrs. Tyler's abdominal pain was worse than the usual pain she historically had at home, do you have an opinion whether that fell below the standard of care for nurses, if it happened?
"`. . . .
"`A. I just want to make sure I understand your question properly. . . . Are you saying, sir, that if [Nurse] Greene didn't communicate to Nurse Swearingen that the patient had abdominal pain worse than ever, would that fall below a standard of care, if it happened?
"`Q. And in the context of Mrs. Tyler being an atrial fibrillation patient who spontaneously converted; right?
"`A. It would have fallen below standard of care if she didn't communicate that information to Nurse Swearingen.
"`Q. In other words, we're talking about the level of pain, the quality of pain?
"`. . . .
"`A. Yes. That's part of our assessment.'"
(Robert's brief, pp. 49-50 (quoting plaintiff's trial exhibit 163, pp. 48-49).)[16]
The Infirmary argues that Nurse Cepero's testimony was insufficient to establish that Nurse Greene was negligent. The Infirmary contends that Nurse Cepero's testimony is deficient because, the Infirmary says, it fails to give "[t]he judge and jury . . . [a] benchmark by which to assess *1091 [Nurse Greene's] care." (Infirmary's brief, pp. 33-34.) The Infirmary cites two cases: Henson v. Mobile Infirmary Ass'n, 646 So.2d 559 (Ala.1994); and Pruitt v. Zeiger, 590 So.2d 236 (Ala.1991).
In Henson, this Court held that a doctor's testimony as to "the `safest' way for a health care provider to prepare a patient for an MRI test" did not necessarily establish "what is required by `reasonable care, skill and diligence.'" 646 So.2d at 563 (emphasis added). This Court noted that the doctor "repeatedly stated that his testimony reflected his individual opinion, and he conceded that health care providers could have opposing opinions as to `the best course of action' in a given situation and still `be within the standard of the care.'" 646 So.2d at 563. This Court concluded that "by limiting his testimony to the statement of a `personal opinion,' [the doctor] failed to address a community standard (of what is reasonable `care, skill and diligence')." 646 So.2d at 563.
Henson is distinguishable from this case. Unlike the doctor in Henson, Nurse Cepero expressed her familiarity with the applicable standard of care. (Robert's brief, p. 49 (citing plaintiff's trial exhibit 163, pp. 30-31).) Moreover, Nurse Cepero testified that a failure by Nurse Greene to "communicate to Nurse Swearingen that [Lida] had abdominal pain worse than ever . . . would have fallen below standard of care." Unlike the testimony at issue in Henson, it is not apparent that Nurse Cepero's statement was based on only her personal opinion.
In Pruitt, this Court held that the standard of care had not been established by the plaintiff's expert. Regarding the defendant's care, the expert had testified that his "`main complaint and objection was the breakdown or the absence of or the deterrence of any communication between the various caretakers.'" 590 So.2d at 238. This Court rejected that statement as establishing the standard of care.
"Although Dr. Taylor alluded to a `breakdown' in communication throughout his testimony, he failed to explain the manner in which communication was deficient. It was incumbent upon Dr. Taylor to explain how `physicians . . . in the same general neighborhood, and in the same general line of practice,' Ala. Code 1975, § 6-5-484(a), would communicate under the circumstances presented in this case. A blanket statement that communication was poor does not establish a standard of care. `In order to establish a physician's negligence, the plaintiff must offer expert medical testimony as to the proper practice, treatment, or procedure.' Dobbs v. Smith, 514 So.2d 871, 872 (Ala.1987). Dr. Taylor did not describe a procedure that rises to the level of a standard of care. He merely gave his opinion as to what Dr. Zeiger should have done under the circumstances presented in this case. `The law does not permit a physician to be at the mercy of testimony of his expert competitors, whether they agree with him or not.' Sims v. Callahan, 269 Ala. 216, 225, 112 So.2d 776, 783 (1959).
"Although Dr. Taylor was repeatedly asked to describe the standard of care, he was unable to define that standard or describe any procedure that Dr. Zeiger was required to follow in order to comply with the standard of care. The following is representative of the broad statements made by Dr. Taylor in response to this line of questioning:
"`Q. Doctor, then, is it your opinion that Dr. Zeiger deviated from the national medical community standards in the care and treatment of Mr. Pruitt in that regard in this case?

*1092 "`A. Well, I don't want to point fingers. But I do think that there was some reduced care below the standards.'
"Testimony that the care rendered was `below the standards' without establishing those standards does not satisfy the Pruitts' burden. Before the expert witness can establish a deviation from the standard of care, the witness must establish the standard from which the deviation occurred.
"In Hines v. Armbrester, 477 So.2d 302 (Ala.1985), this Court stated:
"`We are to view the testimony [of the plaintiff's expert] as a whole, and, so viewing it, determine if the testimony is sufficient to create a reasonable inference of the fact the plaintiff seeks to prove. In other words, can we say, considering the entire testimony of the plaintiff's expert, that an inference that the defendant doctor had acted contrary to recognized standards of professional care was created?'
"Id. at 304-05. In viewing the testimony in this case as directed in Hines, we conclude that the Pruitts failed to meet their burden to produce competent expert testimony of Dr. Zeiger's malpractice."
590 So.2d at 238-39.
Pruitt, however, is also distinguishable from the instant case. First, Nurse Cepero did not make a generalized criticism of Nurse Greene's communication to Nurse Swearingen. Instead, Nurse Cepero testified that Nurse Greene's action in failing to communicate a very specific item of information  i.e., Lida's description of her pain as the worst abdominal pain she had ever experienced  fell below the applicable standard of care. Second, unlike the scenario in Pruitt, there is a specific way in which Nurse Greene could have complied with the standard established by Nurse Cepero's testimony. That is, if Nurse Greene had communicated to Nurse Swearingen that Lida reported experiencing the worst abdominal pain she had ever had, then her communication would not have violated the standard of care.[17]
Consequently, Robert offered sufficient evidence of the standard of care applicable to Nurse Greene. Even so, the Infirmary also contends that testimony at trial "shows Nurse Greene did communicate that [Lida] `had abdominal pain worse than ever.'" (Infirmary's brief, p. 34.) However, the trial testimony cited by the Infirmary *1093 does not show that Nurse Greene communicated that Lida had abdominal pain that was "worse than ever." Instead, the testimony relied on by the Infirmary shows that Nurse Greene reported to Nurse Swearingen that Lida said the pain was "worse than usual." See, e.g., Infirmary's brief, p. 34 (quoting Nurse Swearingen's testimony at trial that "`[Nurse Greene] told me that . . . [Lida] was having nausea and abdominal pain. . . . She told me that it was worse than usual. . . . [Lida] expressed that her abdominal pain was worse than usual. . . .'" (emphasis added)); Infirmary's brief, p. 36 (quoting Dr. DeVille's testimony that "`I was told [by Nurse Swearingen] that the pain was worse than usual'" (emphasis added)).
Abdominal pain that is "worse than usual" may indeed be abdominal pain that is the worst a person has ever experienced. However, there was evidence  most notably the focus note prepared by Nurse Greene  that Lida described the pain as the worst she had ever experienced. There also was evidence that, despite Lida's description of the pain as the worst she had ever experienced, Nurse Greene reported the pain as being only "worse than usual." Consequently, the jury had sufficient evidence from which it could conclude that Nurse Greene breached the standard of care in reporting Lida's pain.[18]

C.
The Infirmary does not dispute that there was sufficient evidence to show that Lida suffered from bowel infarction that caused her death. Nor does the Infirmary dispute that there was sufficient evidence to support Robert's theory that the bowel infarction was caused by a peripheral embolization  i.e., a thrown embolus  that eventually lodged in Lida's superior mesenteric artery resulting in "acute mesenteric ischemia."[19] However, the Infirmary contends that Robert failed to offer sufficient evidence to show that Nurse Greene's failure to accurately report Lida's pain probably caused or contributed to Lida's death. Specifically, the Infirmary contends that "there was absolutely no evidence . . . that an earlier examination . . . by any physician would have resulted in a different diagnosis, different treatment plan, or different outcome for [Lida]." We disagree.
"`To prove liability in a medical malpractice case, the plaintiff is required to show that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.' Parker v. Collins, 605 So.2d 824, 826 (Ala.1992). `There must be more than the mere possibility that the negligence complained of caused the injury; rather, there must be evidence that the negligence complained of probably caused the injury.' Id.

". . . Unless `the cause and effect relationship between the breach of the standard *1094 of care and the subsequent complication or injury is so readily understood that a layperson can reliably determine the issue of causation,' causation in a medical-malpractice case must be established through expert testimony. Cain v. Howorth, 877 So.2d 566, 576 (Ala. 2003); see also Bradley v. Miller, 878 So.2d 262 (Ala.2003); Rivard v. University of Alabama Health Servs. Found., P.C., 835 So.2d 987 (Ala.2002)."
DCH Healthcare Auth. v. Duckworth, 883 So.2d 1214, 1217-18 (Ala.2003).
In his brief to this Court, Robert provides the following summary of the medical evidence introduced at trial regarding the risk and symptoms of acute mesenteric ischemia in patients with atrial fibrillation:
"Atrial fibrillation has a number of potential complications, including, most dangerously, the risk of `peripheral embolization' or throwing a blood clot.5
"People in atrial fibrillation can, and often do, cardiovert back to a normal or `sinus' rhythm on their own. Other times doctors will cardiovert patients pharmacologically or electrically. However, cardioversion brings an increased risk of peripheral embolization. . . . The reason for the increased risk is that a heart in atrial fibrillation generally does not have the power to dislodge a clot which may develop in its atrium. However, once normal sinus rhythm is restored, the efficiency of the heart is restored and clots which have developed are expelled to other parts of the body. . . . For this reason, A-fib patients are anticoagulated for thirty days prior to cardioversion. . . .
"Every one of Mrs. Tyler's treating health care providers were aware of her risk of embolization, including, especially, the Infirmary's nurse, Amy Greene.[[20]] . . . It was . . . acknowledged . . . that a blood clot could travel to the patient's mesenteric vasculature causing `acute mesenteric ischemia,' which is fatal if not promptly diagnosed . . . and immediately treated. . . . The classic symptom of acute mesenteric ischemia is a sudden acute onset of severe abdominal pain so dramatic and out of proportion to other findings that the diagnosis should not be missed.

"____________
"5 The most dangerous complication is a peripheral embolization  i.e., throwing a blood clot. . . . Peripheral embolization occurs when a blood clot in the heart, created because of the heart's decreased ability to move blood during atrial fibrillation (i.e., stasis), breaks loose and travels to other parts of the body where it lodges and blocks the blood and oxygen supply to certain organs and extremities. . . . "
(Robert's brief, pp. 14-18 (footnotes and citations omitted).)
Regarding the diagnosis and treatment of acute mesenteric ischemia, Robert's brief offers this summary:
"[E]mbolization is easily diagnosable and treatable. Generally, all that is required is an x-ray to rule out other possible abdominal problems, an angiogram to confirm the diagnosis, and a *1095 simple embolectomy performed by a general or vascular surgeon to evacuate the blood clot and restore blood flow. . . . Depending on the location and size of the clot, vasodilating drugs may be used. . . . The diagnosis and treatment carries little risk of complication. . . . When timely detected and treated, the probability of survival is great.12
"____________
"12 Clinical trials and studies utilizing the approach of early angiography established the likelihood of survivability when diagnosed promptly. The key to survival is to treat the condition before signs of peritonitis and infarction begin to appear. Medical literature read to the jurors confirmed these points:
" `In our center, more than 50% of the patients with AMI treated according to our approach survived, and more than 75% have lost less than a meter of intestine. The importance of early diagnosis is emphasized by the survival of 90% of patients who had AMI but no signs of peritonitis and who had angiography early in their course. Ideally, all patients with AMI should be studied when plain films of the abdomen are normal, before signs of an acute surgical abdomen and laboratory evidence of infarction appear.'
" `[I]f the diagnosis is not made before intestinal infarction, the mortality rate is seventy percent to ninety percent.' . . . "
(Robert's brief, pp. 19-20 (citations and footnotes omitted).)
Robert does not contend that Nurse Greene was responsible for diagnosing acute mesenteric ischemia. However, he does argue that there was sufficient evidence to show that timely diagnosis and successful treatment of Lida's acute mesenteric ischemia was prevented by Nurse Greene's failure to adequately communicate to Nurse Swearingen (and, in turn, to Dr. DeVille) the severity of Lida's abdominal pain. In other words, Robert contends that if Nurse Greene had adequately communicated to Dr. DeVille the severity of Lida's pain, Lida's acute mesenteric ischemia probably would have been timely diagnosed and successfully treated. Specifically, Robert argues that adequate communication from Nurse Greene to Nurse Swearingen probably would have caused Dr. DeVille to order a stat or emergency consultation with a surgeon, which, in turn, probably would have resulted in a different outcome, i.e., Lida probably would have survived.[21]
At trial, Robert presented testimony from Dr. David J. Korn, a doctor board-certified in internal medicine, cardiology, and critical care. Dr. Korn testified as to what was required by the standard of care *1096 applicable to Dr. DeVille. Specifically, Dr. Korn testified as follows:
"Q. Do you have an opinion, based upon your training, education, and experience, as to whether a cardiologist, any board-certified cardiologist, . . . as of June 1999 had an obligation to have a high index of suspicion of a vascular emergency where there was a patient with an identified risk of peripheral embolization that was in the hospital in the telemetry unit; the patient had been in atrial fibrillation; had not been fully anti-coagulated to a therapeutic level; at that time, spontaneously converted from atrial fibrillation to normal sinus rhythm; shortly thereafter, converted from normal sinus rhythm back to atrial fibrillation; and soon thereafter, was followed by the worst gut pain she had ever had in her life? I want you to assume those facts.
"A. Yes, sir.
"Q. Would a reasonable cardiologist practicing then and there, if . . . that information was communicated to that person, have an obligation to have a high index of suspicion of peripheral embolization?
"A. The answer is yes.
"Q. And why is that your opinion?
". . . .
"A. Okay. The answer is that you have to have a high index of suspicion for embolization when someone is in atrial fibrillation. Atrial fibrillation is an irregular heartbeat, and when that occurs, there's a very high likelihood or possibility that the patient may have a clot that's thrown from the heart.
"When this patient went back and forth from atrial fibrillation back to sinus rhythm and then from sinus rhythm back to atrial fibrillation, she was at increased risk at that point for throwing those clots. Those are the specific times when she goes from atrial fib to sinus and from sinus to atrial fib. Those are the key areas. So, when she had the worst pain that she ever had, it was incumbent upon the doctor to say, oh, my, what's going on with this lady. It was, obviously, a risk of a clot going somewhere, and because she was complaining of abdominal pain or gut pain, the likely place that the clot was going was to the abdominal area."
(Emphasis added.)
Dr. Korn also testified regarding what he referred to as a "differential diagnosis."
"Q. I want you to assume that a reasonable cardiologist, board certified, practicing on Saturday, June 5, 1999, with that presentation, if he examined the patient and she was doubled over in pain with that history that we've gone over, whether it would be incumbent upon them, if they were complying with the standard of care, to include vascular blood clot in their differential?
". . . .
"A. Yes, sir.
"Q. And do you have an opinion whether the failure to include that in the differential would be a violation of the standard of care applicable to cardiologists?
". . . .
"A. Yes, it is a violation of the standard of care and is applicable to all cardiologists, yes.
". . . .
"Q. Are you familiar with the standard of care as it pertains to how cardiologists should deal with the risks of peripheral embolization if it's included in the differential?
"A. Yes, sir.
"Q. . . . What is a differential? . . .

*1097 "A. Okay. A differential diagnosis is something that we learned when we were in medical school, that we have to come up with a number of different diagnoses as to the possibilities of what's going on with a patient. In other words, if a patient has abdominal pain, it may come from a number of different sources. It could be gallbladder, could be stomach, could be intestine. So, a differential diagnosis means listing the possibilities of where the source of the pain comes from.
"Q. . . . In following the standard of care, is there a priority of how those are ruled out?
"A. Yes, you . . . try to go with the most dangerous one first and then come down to the ones that are not as dangerous.
"Q. And peripheral embolization is an emergency, if it exists?
"A. Peripheral embolization is an emergency. I mean, you know, clots can fly off to the head. They can go to the gut. They can go to the legs. Anywhere they go is, obviously, an emergency.
". . . .
"Q. What about if you include peripheral embolization in your differential, what's the approach by a cardiologist?
"A. Basically, the approach by a cardiologist, and even an internist, but by a cardiologist too is the fact that patients have to be anti-coagulated promptly. And . . . [w]hen she starts to have the bad abdominal gut pain, at that point, it's very important to actually come in, see the patient, examine the patient, see what's going on with this lady and make the appropriate decisions as to whether there's an abdominal catastrophe or disaster going on so that you may have to get a gastroenterologist to see her, a surgeon to see her, and get the ball rolling so we can take care of this lady before she dies."
(Emphasis added.)
Thus, Dr. Korn, a similarly situated health-care provider to Dr. DeVille, testified that a reasonable cardiologist  when told of a patient who had undergone spontaneous conversion from atrial fibrillation to normal rhythm and back again, which was accompanied by the worst abdominal pain the patient had ever experienced  would have promptly gone to examine the patient. Moreover, Dr. Korn testified as follows based on a 1993 article from the American Heart Association regarding acute mesenteric ischemia and its diagnosis and treatment:
"Q. There's a sentence that precedes that I would like to cover with you. . . . `The most catastrophic event is acute embolic occlusion of the superior mesenteric artery.'
"A. That's correct, that's what it says.
"Q. 1993?
"A. Yes, sir.
"Q. American Heart Association?
"A. That's correct.
". . . .
"Q. Do you agree with this, Doctor: The clinical presentation  And we're talking about acute embolic occlusion of the superior mesenteric artery. `The clinical presentation is so dramatic and characteristic, acute, unrelenting abdominal cramping, that the diagnosis should not be missed.' Do you agree with that?
"A. Yes, I do.
"Q. `Soon after the occlusion, the patient will have loud peristaltic rushes that coincide with the development of the pain, but no abdominal tenderness.'
"Q. Do you agree with that?

*1098 "A. Yes, I do.
". . . .
"Q. The same article, Doctor, from the American Heart Association, 1993. See if you agree with this. . . . `There is no time for delay with acute occlusion of the superior mesenteric artery.' You agree with that?
"A. Yes, I do.
"Q. `Death of the small bowel is accompanied by a very high mortality rate. When the diagnosis is not made before bowel infarction occurs, the mortality rate is 70 to 90 percent.' You agree with that?
"A. Yes, sir.
"Q. I'm particularly interested in the next sentence. `Immediate referral to a general or vascular surgeon without awaiting the results of other than basic laboratory work is mandatory.' Do you disagree with that?
"A. I do not disagree with that. I do agree with that."
In this case, however, the cardiologist responsible for Lida's care, Dr. DeVille, did not go to the hospital to examine Lida. At trial, Dr. DeVille explained that the facts about Lida that were presented to him did not indicate that there was an emergency or that he otherwise needed to examine Lida. In particular, he testified as follows regarding the descriptions of Lida's complaints of abdominal pain:
"Q. Were you told about abdominal pain and nausea in those three telephone calls?
"A. Yes, sir, I was.
"Q. Do you have a recollection of whether or not you were told about that in the first call or the second call?
"A. Well, what I remember was in, the first call, I was told that she had some  I can't remember if the phrase was abdominal or epigastric discomfort, but that she had had that as an outpatient and it was recurring. The message was that it didn't seem to be a new problem.

"Q. Okay. . . . Was there a description given to you as to the severity of the pain? What type of description were you given?
"A. In the first call, it was just the presence of the discomfort. That's all I remember being told was just that there was epigastric or abdominal, I don't remember which, pain or discomfort in the first call. And where my memory really sort of fails me is whether it was in the second or third call that I was told that the pain was worse than usual.

". . . .
"Q. And you remember being told she had a history of abdominal pain or how did you put it, outside the hospital?
"A. That before she had come into the hospital, she had had recurrent episodes of abdominal pain.
". . . .
"Q. Were you told by [Nurse] Swearingen at some point about any abdominal assessment that was done by [Nurse] Greene?
"A. I was told that the nurse had assessed the patient and there  although I don't remember the exact specifics of it, the message was the abdominal exam was unremarkable, that there was  that there was nothing that suggested an acute or emergent problem in the abdomen.
". . . .
"Q. . . . What did you consider in regard to the first call about the abdominal pain and nausea? What consideration did you have at that point about that?
"A. The first consideration was that she may be having epigastric or lower *1099 chest or upper abdominal discomfort due to the rapid heartbeat, which you will sometimes see. We call it an anginal equivalent. It's not necessarily  I didn't think she was having a heart attack because she had had a normal cath, but in patients who have a very rapid rate, sometimes they'll get epigastric or chest or throat discomfort. So, my initial thought was that if we got control of her heart rate and her blood pressure, that her abdominal symptoms might improve.
". . . .
"A. When I'm being told that she has a recurrent abdominal problem that is now worse than usual and this is a patient who just  The information I got was she had just been started on Heparin. The first thing I thought of was a bleeding ulcer. She had peptic ulcer disease. Other considerations would be gallbladder or any of the other abdominal things, but the first thing that came to my mind was a peptic ulcer."
(Emphasis added.) In addition, Dr. DeVille testified that he was not told that Lida was "doubled over in pain" or that she complained of the "worst pain she'd ever had in her life." Similarly, Nurse Swearingen testified that she was not told by Nurse Greene that Lida had complained of the worst abdominal pain she had ever experienced.
Based on the testimony of Dr. Korn, including his testimony regarding the 1993 article from the American Heart Association, there was sufficient evidence from which the jury could conclude that a patient suffering from acute mesenteric ischemia is characterized by an "acute, unrelenting abdominal cramping" that is "so dramatic" that a reasonable cardiologist "should not . . . miss" its diagnosis. In this case, as noted, there was evidence showing that Lida complained to Nurse Greene of suffering from the worst abdominal pain she had ever experienced. However, there also was evidence from which the jury could conclude that rather than communicating that information to Nurse Swearingen (and, in turn, to Dr. DeVille), Nurse Greene instead communicated that Lida's abdominal pain was merely a "worse-than-usual" occurrence of a recurrent problem.
Thus, there was sufficient evidence for the jury to conclude that Nurse Greene's negligent failure to accurately communicate Lida's pain caused Dr. DeVille to fail to diagnose  or to include in his "differential diagnosis"  Lida's acute mesenteric ischemia. In other words, there was sufficient evidence for the jury to conclude that if Nurse Greene had accurately communicated Lida's symptoms of pain to a reasonable cardiologist, it is more probable than not that the cardiologist would have included acute mesenteric ischemia in his differential diagnosis. Consequently, the Infirmary is not accurate in its claim that there was "absolutely no evidence . . . that an earlier examination . . . by any physician would have resulted in a different diagnosis, different treatment plan, or different outcome for [Lida]."
Moreover, based on Dr. Korn's testimony, a reasonable cardiologist presented with that situation probably would have initiated  as part of that diagnosis  a stat or emergency order for a consultation with a surgeon. At trial, Robert presented the following testimony from Dr. Garry Ruben, a board-certified general and peripheral vascular surgeon who testified regarding proximate causation:
"Q. Now, I want you to assume the following. I want you to assume that a general surgeon who practices and has privileges to do vascular surgery or a vascular surgeon receives a telephone call around 1:45 or 2:00 o'clock on a *1100 Saturday afternoon and receives the following information: There is a 72-year-old patient who had atrial fibrillation, was admitted to the telemetry unit. She had not been anticoagulated. The plan was to anticoagulate her before cardioversion and to do so for 30 days before cardioversion, but that she spontaneously, on her own, converted from atrial fibrillation to normal sinus rhythm at 11:57 a.m., and, thereafter, at one  between 1:20 and 1:35 spontaneously converted back and had an immediate sudden onset of the worst abdominal pain she had ever had, and you are asked to consult. . . . Do you know what a reasonably prudent surgeon or vascular surgeon would do or should do under those circumstances?
"A. I believe that I do, yes. . . .
"Q. Okay. And what would . . . a reasonably prudent specialist . . . with the same specialty, general surgery with vascular surgical privileges or a vascular surgeon do in response to such a communication?
"A. Based upon the information you've given me, a surgeon would order an urgent study, a stat study to evaluate the mesenteric blood supply. In the alternative, if that was not possible to be accomplished, then the blood supply would either have to be evaluated by another stat study if one was available, but, more likely, one would then take the patient to the operating room to evaluate the intestines and the gut and the blood supply intraoperatively.
"Q. What do you mean by stat?
"A. Well, . . . a surgeon would want the study done within, I would say, two to three hours at the outset.
"Q. And what study? Are you referring to a specific study?
"A. Yes, sir, I'm talking about what we call a mesenteric arteriogram or a mesenteric angiogram. . . .
"Q. If that was available, do you have any experience as to how long that takes. . . . [i]f it's ordered stat?
"A. The study itself can be done in an hour. Usually, you have, you know, an hour to get the patient ready and down and prepare the unit, so usually it can be done in two to three hours."
Thus, Dr. Ruben's testified that a reasonably prudent surgeon would have ordered a stat study  specifically, a mesenteric arteriogram or a mesenteric angiogram  to be completed in two or three hours.[22] Dr. Ruben testified that an arteriogram or angiogram would have revealed the blood clot in Lida's superior mesenteric artery, and, once the presence of the clot was known, a general surgeon could have removed the clot by performing an embolectomy.[23]
According to Dr. Ruben, had an embolectomy been performed before Lida's bowel infarcted, Lida would have survived:
"Q. Doctor, . . . [d]o you have an opinion whether, if a vascular surgeon on the evening of June 5, 1999, or general surgeon, for that matter, who could do [the embolectomy] procedure that you're talking about had gotten to Mrs. Tyler and had done the procedure before infarction occurred of the bowel, do you *1101 have an opinion whether it's more likely than not that she would have survived?
"A. I do have an opinion.
"Q. What is your opinion?
". . . .
"A. . . . [M]y opinion is that she would have survived. . . . So, if we operate on her and save the bowel before it infarcts, we save the bowel and, certainly, enough bowel for her to survive. And since she is a relatively healthy 70-year-old woman, her chances of surviving were overwhelming."[24]
(Emphasis added.)
Thus, there was sufficient evidence to show that an accurate communication from Nurse Greene to Nurse Swearingen regarding Lida's pain probably would have ultimately resulted in a surgeon performing an embolectomy, which Lida probably would have survived. The only remaining question regarding causation is whether there was sufficient evidence that there was enough time for those events to take place.
In his brief to this Court, Robert summarizes the time that was available for those events to occur:
"There were at least six hours during which diagnostic and restorative efforts could have been initiated before Mrs. Tyler's bowels were damaged so severely that she became `unsalvageable.' . . . According to Dr. Kirby, Mrs. Tyler's bowels infarcted late Saturday night or early Sunday morning:
"`Q : Do you know or have an opinion when her bowel infarcted?
"`A: I don't know with certainty. I would estimate sometime between 10:00 p.m. and 2:00 a.m.
"`. . . .
"`Q: That Saturday?
"`A: June 5 to June 6, over that period of time.'
"Dr. Ruben agreed with [the opinion of Dr. Donald Kirby, a gastroenterologist whose deposition testimony was introduced at trial,] of the range between 10:00 p.m. on June 5th and 2:00 a.m. on June 6th . . . stating that Mrs. Tyler's bowels infarcted at approximately 11:00 p.m. `give or take an hour or so.' . . . He noted that according to Nurse Jason Lundy's June 5th 7:00 p.m. nursing assessment . . ., Mrs. Tyler's gastrointestinal assessment was `[Within Normal Limits]' with no indication of any `bowel *1102 sounds absent or hypoactive.' . . . So, too, Dr. Williamson's 6:00 to 6:30 p.m. gastroenterology consult revealed normal active bowel sounds."
(Robert's brief, pp. 63-64.) The Infirmary has not demonstrated that this evidence was insufficient to support Robert's assertion that there was enough time for a reasonable cardiologist to order a stat surgical consult and for a surgeon, once consulted, to examine, diagnose, and successfully treat Lida's condition. Accordingly, Robert presented sufficient evidence from which the jury could conclude that Nurse Greene's negligent communication prevented Lida from receiving the medical care that probably would have prevented her death from acute mesenteric ischemia.

D.
The Infirmary also argues that the "good count/bad count" rule requires reversal and a new trial in this case.[25] We disagree.
Ex parte Grand Manor, Inc., 778 So.2d 173, 177 (Ala.2000), includes the following discussion of the "good count/bad count" rule:
"In a case where several claims are submitted to the jury, over JML motions by the defendant, and the jury renders a general verdict as to those claims, on appeal this Court must determine whether the plaintiff presented substantial evidence in support of each of the claims. See Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3, 8 (Ala.1997). This Court will not presume that the general verdict was returned on a `good count' (i.e., on a count or claim supported by substantial evidence); rather, `[i]f a verdict should have been directed as to one or more of the claims, then the judgment based on those claims must be reversed.' Id. However, where the defendant does not challenge the `bad counts' (i.e., those not supported by substantial evidence) with specificity in his motions for JML, this Court will presume that the verdict was returned on the `good count.' See Goodyear Tire & Rubber Co. v. Washington, 719 So.2d 774, 778 (Ala.1998); Aspinwall v. Gowens, 405 So.2d 134, 138 (Ala.1981).2
"____
"2 In Aspinwall, this Court held:
"`[I]f a complaint has more than one count and the defendant believes that the evidence is not sufficient to support one or more of those counts, he must challenge this by motion for directed verdict, specifying the count which is not supported by evidence and detailing with specificity the grounds upon which the particular count is not supported by the evidence. If this is not done and all counts go to the jury and a general verdict is returned, the court will presume that the verdict was returned on a valid count.'
"405 So.2d at 138 (opinion on application for rehearing). This Court has also held:

*1103 "`It follows from [the holding in Aspinwall] that, if the defendant files a motion for [a JML] as to a count which is not supported by the evidence and the court denies such a motion, a general jury verdict will not be presumed to have been returned on a count which is supported by the evidence. . . . We cannot presume that the general jury verdict relates to one of the counts which the evidence did support, where it is equally possible that it is based on the count which is unsupported by the evidence.'
"John Deere Indus. Equip. Co. v. Keller, 431 So.2d 1155, 1157 (Ala.1983); accord National Sec. Fire & Cas. Co. v. Vintson, 454 So.2d 942, 946 (Ala.1984); South Cent. Bell Tel. Co. v. Branum, 568 So.2d 795, 798-99 (Ala.1990)."
It is necessary to determine what "counts" or "claims" were submitted to the jury in this case. Robert and the Infirmary do not agree as to what constitutes a "count" or "claim." In essence, Robert argues that the allegations in paragraph 8.a-8.e of his complaint constitute only one "count" or "claim." The Infirmary, however, argues in its reply brief that each "theory" of negligence constitutes a separate "count" or "claim." It states:
"This was a `multiple theory case' against the Infirmary. This Court cannot determine, for example, whether the jury found for [Robert] based upon the alleged failure to change the `see today' order, or based upon Nurse Greene not stating the exact words `worse pain ever.'"
(Infirmary's reply brief, p. 27.)
We need not decide whether this case is a "multiple theory case," however. Even if it were, the Infirmary has not shown that more "theories" were submitted to the jury than those allegations stated in the plaintiff's seventh amended complaint, which also formed the basis of the trial court's instruction to the jury.
In its instruction to the jury, the trial court stated:
"[Robert] sues Mobile Infirmary alleging breaches of the standard of care; more specifically, the failure to properly assess the condition of Lida Mae Tyler, failing to properly report the condition of Lida Mae Tyler, failure to obtain appropriate medical care and treatment for the condition of Lida Mae Tyler, failure to timely notify physicians of the condition of Lida Mae Tyler, and failing to timely act and obtain treatment for Lida Mae Tyler."
That was the only instruction regarding Robert's allegations that the Infirmary had breached a standard of care; it was based on the language of the plaintiff's seventh amended complaint, which states:
"8. The death of LIDA MAE TYLER was proximately caused by the negligence of the [Infirmary] by and through its agents, servants or employees and including various nursing personnel acting within the line and scope of their employment as employees of the [Infirmary] in one or more of the following respects:

"a. Failing to properly assess the condition of the said LIDA MAE TYLER on June 5, 1999 . . . ;
"b. Failing to properly report the condition of the said LIDA MAE TYLER on June 5, 1999 . . . ;
"c. Failing to obtain appropriate medical care and treatment for the condition of the said LIDA MAE TYLER on June 5, 1999 . . . ;
"d. Failing to timely notify physicians of the condition of the said LIDA MAE TYLER on June 5, 1999 . . . ;

*1104 "e. Failing to timely act and obtain treatment for the said LIDA MAE TYLER'S condition on June 5, 1999. . . . "
(Capitalization in original; emphasis added.)
Even if each of those subparagraphs is viewed as a separate "theory," however, each was supported by substantial evidence, namely, the evidence showing that Nurse Greene failed to adequately assess and report Lida's pain, as well as the evidence of what that failure caused. Subparagraphs 8.a and 8.b allege specifically that the Infirmary's nurses failed to properly assess and report Lida's condition. The causation evidence from that failure is substantial evidence supporting the allegations in subparagraphs 8.c and 8.e, and the evidence suggesting that Nurse Greene did not inform Nurse Swearingen or Dr. DeVille of Lida's condition, i.e., that Lida was experiencing the worst abdominal pain she had ever had, is substantial evidence supporting the allegation in subparagraph 8.d. Consequently, the Infirmary has not shown that a "bad" negligence "count" or "claim" was submitted to the jury.

II.
The Infirmary argues that this Court should revive § 6-5-547, Ala.Code 1975,[26] which limited a judgment against a health-care provider to $1,000,000. Section 6-5-547 was declared unconstitutional in Smith v. Schulte, 671 So.2d 1334, 1343-44 (Ala.1995). In support of its argument for the revival of the statute, the Infirmary cites this Court's decision in Ex parte Apicella, 809 So.2d 865, 874 (Ala.2001).
In Mobile Infirmary Medical Center v. Hodgen, supra, this Court rejected a similar argument to revive the damages limitation imposed by § 6-5-544, Ala.Code 1975, a companion statute to § 6-5-547. This Court explained in Hodgen:
"Mobile Infirmary next invites this Court to revive § 6-5-544(b), Ala.Code 1975, which, at one time, placed a $400,000 cap on the noneconomic damages that could be awarded in a medical-malpractice case. In Moore v. Mobile Infirmary Association, 592 So.2d 156 (Ala.1991), we declared § 6-5-544(b), Ala.Code 1975, unconstitutional, holding that the cap violated the right to a trial by jury and the equal-protection guarantees under the Alabama Constitution. Mobile Infirmary argues that because this Court has since acknowledged that a cap on punitive damages does not violate the right to a trial by jury under the Alabama Constitution, see Ex parte Apicella, 809 So.2d 865 (Ala.2001), and because this Court has acknowledged that the Alabama Constitution contains no equal-protection clause, see Ex parte Melof, 735 So.2d 1172 (Ala.1999), this Court should overrule Moore, supra, reinstate the $400,000 cap and apply the cap to Hodgen's punitive-damages award in this case. We decline Mobile Infirmary's invitation to revive § 6-5-544(b), Ala.Code 1975, because, since we decided Moore, the Legislature has explicitly addressed this issue.
"The Legislature, when it enacts legislation, is presumed to have knowledge of existing law and of the judicial construction of existing statutes. See Ex parte *1105 Fontaine Trailer Co., 854 So.2d 71 (Ala. 2003). Thus, with the knowledge that § 6-5-544(b), Ala.Code 1975, had been declared unconstitutional in 1991 and that § 6-11-21, Ala.Code 1975, which provided a general cap on punitive-damages awards, had been declared unconstitutional in 1993, see Henderson v. Alabama Power Co., 627 So.2d 878 (Ala. 1993), the Legislature in 1999 rewrote § 6-11-21, Ala.Code 1975, to provide caps on punitive-damages awards to apply `in all civil actions,' except in class actions, wrongful-death actions, and actions alleging the intentional infliction of physical injury. Section 6-11-21(a), (b), (d), (h), and (j), Ala.Code 1975. Section 6-11-21, Ala.Code 1975, as so amended, has been recognized as a complete replacement of the old statutory restrictions on punitive damages. See Morris v. Laster, 821 So.2d 923, 927 (Ala.2001).
"The fundamental principle of statutory construction is that words in a statute must be given their plain meaning. See Simcala, Inc. v. American Coal Trade, Inc., 821 So.2d 197, 202 (Ala.2001) (citing Ex parte Smallwood, 811 So.2d 537, 539 (Ala.2001); Ex parte Krothapalli, 762 So.2d 836, 838 (Ala.2000); and IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)); Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., 746 So.2d 966, 969 (Ala.1999) (citing John Deere Co. v. Gamble, 523 So.2d 95 (Ala.1988)). Section 6-11-21(d), Ala.Code 1975, provides:
"`(d) Except as provided in subsection (j), in all civil actions for physical injury wherein entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or one million five hundred thousand dollars ($1,500,000), whichever is greater.'
"(Emphasis added.) As noted above, the only exclusions from this cap on punitive-damages awards for claims alleging physical injury are class actions, wrongful-death actions, and actions alleging the intentional infliction of physical injury. The wording of this statute, i.e., that it applies to `all civil actions,' clearly encompasses actions alleging physical injury caused by medical malpractice. Although the Legislature excluded from this statute certain types of claims, the statute makes no mention of excluding actions brought pursuant to the [Act]. Because the Legislature, with knowledge of this Court's holding as to § 6-5-544(b), Ala.Code 1975, enacted a new statutory cap on punitive damages that clearly encompasses claims brought pursuant to the [Act], we decline Mobile Infirmary's invitation to revisit the Moore decision, despite the erosion of its holdings, and to reinstate § 6-5-544(b), Ala.Code 1975."
884 So.2d at 813-14.
Although relied on extensively by Robert in his brief to this Court, see Robert's brief, pp. 66-69, the Infirmary has not addressed this Court's decision in Hodgen. Thus, the Infirmary has not responded to Robert's argument that the reasoning in Hodgen applies to preclude the Infirmary's attempt to revive § 6-5-547 in this case. Consequently, we decline the Infirmary's invitation to revive the damages limitation of § 6-5-547.[27]

*1106 III.

The Infirmary contends that under the guideposts set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and the factors set out in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), it is entitled to a remittitur of the $5,500,000 punitive-damages award. In a postjudgment order, the trial court applied the Gore guideposts and the Hammond and Green Oil factors and concluded that no remittitur was necessary.
"We review the trial court's award of punitive damages de novo, with no presumption of correctness." Mack Trucks, Inc. v. Witherspoon, 867 So.2d 307, 309 (Ala.2003) (citing Acceptance Ins. Co. v. Brown, 832 So.2d 1, 24 (Ala.2001)). Our de novo review of the punitive-damages award in this case, which involved our application of the Gore guideposts and the Hammond and Green Oil factors, leads us to conclude that the trial court should have reduced the award and that the punitive-damages award should have amounted to no more than $3,000,000.
Thus, we affirm the judgment of the trial court on the condition that, within 14 days of the date of this opinion, Robert file with this Court an acceptance of a remittitur of the punitive-damages award in the amount of $2,500,000, which would result in a judgment for him in the amount of $3,000,000 in punitive damages. Otherwise, the judgment of the trial court will be reversed and the case remanded for a new trial.
AFFIRMED CONDITIONALLY.[*]
SEE, STUART, BOLIN, and PARKER, JJ., concur.
COBB, C.J., and LYONS, WOODALL, and MURDOCK, JJ., concur in part and dissent in part.
COBB, Chief Justice (concurring in part and dissenting in part).
I concur in Parts I and II of the main opinion; however, as to Part III, I must dissent.
I agree with Justice Lyons that the remittitur ordered by this court is excessive; therefore, I respectfully dissent from the part of the opinion so ordering.
LYONS, Justice (concurring in part and dissenting in part).
I concur in all aspects of the main opinion except Part III, as to which I respectfully dissent.
Our Court has consistently construed the wrongful-death remedy in § 6-5-410, Ala.Code 1975, as permitting the recovery of punitive damages only. See Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1221 (Ala.1999) (noting that "this Court has, under the crushing weight of 150 years of stare decisis, consistently held that our wrongful-death statute allows for the recovery of punitive damages only"). The United States Supreme Court has endorsed *1107 the anomaly of permitting the recovery of punitive damages for negligence under Alabama's unique wrongful-death statute:
"The legislation now challenged has been on the statute books of Alabama in essentially its present form since 1872. The liability imposed is for tortious acts resulting in death, but the damages, which may be punitive even though the act complained of involved no element of recklessness, malice, or willfulness, may be assessed against the employer who, as here, is personally without fault. . . .
". . . .
". . . [T]he aim of the present statute is to strike at the evil of the negligent destruction of human life. . . . We cannot say that it is beyond the power of a Legislature, in effecting such a change in common law rules, to attempt to preserve human life by making homicide expensive. It may impose an extraordinary liability such as the present, not only upon those at fault but upon those who, although not directly culpable, are able nevertheless, in the management of their affairs, to guard substantially against the evil to be prevented."
Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 114-16, 47 S.Ct. 509, 71 L.Ed. 952 (1927).
In the aftermath of BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and its progeny, we are required to conduct a due-process analysis in the context of punitive-damages awards that are challenged as excessive. But, unlike other cases in which there is a predicate of compensatory damages against which a multiplier may be applied to determine whether the punitive-damages award is excessive, here we have no such predicate. For want of a better process, the due-process analysis compelled by BMW v. Gore forces me to engage in the callous business of establishing a base price for the value of a human life measured in today's dollars and then extrapolating therefrom an additional sum, also measured in today's dollars, to determine what punitive damages above the base price are appropriate to effectuate the legislative policy of preventing homicide by making it expensive.
Under the circumstances of this case, the jury determined that $5.5 million was appropriate. The Court today affirms conditionally the judgment entered on that verdict upon reduction of the verdict to $3 milliona reduction of almost 50%. I consider such a reduction excessive; therefore, I respectfully dissent as to Part III.
There ought, however, to be a better process. This Court in Savannah & Memphis R.R. v. Shearer, 58 Ala. 672, 678 (1877), construed a statute approved on February 5, 1872, permitting in a wrongful-death action the recovery of "such sum as the jury deem just" to be limited to the recovery of punitive damages. In 1892 in Richmond & Danville R.R. v. Freeman, 97 Ala. 289, 295, 11 So. 800, 802 (1892), this Court saw no substantive difference resulting from an amendment changing the phraseology to "such damages as the jury may assess." Justice McClellan then reaffirmed the construction of the predecessor to the statute applied in Savannah & Memphis Railroad. He did so without compliments for its rationale, stating:
"If [the question whether the wrongful-death statute authorized the recovery of only punitive damages] were [an open one], he [referring to Justice McClellan, as author of the opinion for the Court] should be much inclined to the view so ably urged by counsel, that the statute was primarily intended to afford compensation to the next of kin of a person coming to his death through the wrong of another, and to allow the imposition of *1108 punitive damages only in those cases where they would have been recoverable had the injury fallen short of death."
97 Ala. at 296, 11 So. at 802. Cabined by stare decisis, the Court in Richmond & Danville Railroad, like this Court in numerous subsequent cases over the years, adhered to the construction of the statute as limited to punitive damages. See, e.g., Lance, Inc. v. Ramanauskas.
The second of the four guideposts announced in BMW v. Gore against which a punitive-damages award is measured to determine compliance with due process is the disparity between the actual or potential harm suffered by the plaintiff and the punitive-damages award. Subsequent to BMW v. Gore, I concurred in rejecting a constitutional challenge to the wrongful-death statute in Tillis Trucking Co. v. Moses, 748 So.2d 874, 890 (Ala.1999), in which the Court stated:
"The only basis on which these recent cases [upholding the wrongful-death act] might be questioned is the decision of the Supreme Court of the United States in BMW [of North America, Inc.] v. Gore, [517 U.S. 559 (1996)]. However, this Court in Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188 (Ala.1997), was able to conduct a meaningful review of a wrongful-death punitive-damages award, and we have done so here.
"In Cherokee Electric, supra, the Court applied the three BMW v. Gore `guideposts,' as well as the Hammond [v. City of Gadsden, 493 So.2d 1374 (Ala. 1986)] and Green Oil [Co. v. Hornsby, 539 So.2d 218 (Ala.1989)] principles of review, and affirmed a $3,000,000 wrongful-death judgment on a verdict in an electrocution case. As to the ratio of punitive damages to compensatory damages, the Court stated: `Alabama law allows no compensatory damages in a wrongful death case. This factor, therefore, does not apply here.' 706 So.2d at 1194. Alternatively, one could say that it does not apply as a mathematical ratio, but, if one considers the purpose behind this factor, it applies in the sense of proportionality between the punitive-damages award and the harm that was caused or was likely to be caused by the defendants' conduct. Certainly, the likelihood of death to a driver of a passenger automobile is great in the case of collision with a tractor-trailer truck fully loaded with logs and weighing approximately 90,000 pounds. Certainly, death is a great harm. Whether we say that the ratio factor does not apply, as we said in Cherokee Electric, or that it applies in principle without mathematical application, the first `guidepost' from BMW v. Gore does not require this Court to overturn more than a century of precedent based on law awarding only punitive damages in wrongful-death actions."
(Emphasis added.)
In State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the United States Supreme Court discussed the second guidepost in BMW v. Gore as follows:
"We cited that 4-to-1 ratio [approved in Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1 (1991)] again in Gore. 517 U.S., at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. Id., at 581, and n. 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than *1109 awards with ratios in range of 500 to 1, id., at 582, or, in this case, of 145 to 1."
I am becoming increasingly uncomfortable with the constitutionality of a process that holds, alternatively, that "the ratio factor does not apply" or that it "applies in principle without mathematical application." Tillis Trucking, 748 So.2d at 890. I am willing to reconsider my vote in Tillis Trucking in a future case in which we are reminded of the diminished effect of stare decisis when faced with a question of constitutionality and asked to overrule Tillis Trucking. If a majority of the Court were so inclined, then we would have to make the difficult choice between striking the wrongful-death statute down in its entirety or saving it with a construction of the statute consistent with standards of due process prevailing in the 21st century.
In the meantime, I choose not to ignore the applicability of a ratio, so I must struggle today with the second alternative in Tillis Trucking of treating death as "a great harm" and then attempting to apply a ratio "in principle without mathematical application." 748 So.2d at 890.
WOODALL, Justice (concurring in part and dissenting in part).
I dissent from the main opinion as to the extent of the remittitur of punitive damages. Otherwise, I concur.
MURDOCK, Justice (concurring in part and dissenting in part).
I concur in Parts I and II of the main opinion; I respectfully dissent as to Part III.
NOTES
[1] "Atrial fibrillation is an irregular heart rhythm  arrhythmia  experienced by many Americans. It can develop at any time in a person's life but is primarily found in the older population. It occurs when a person's atrium, an upper chamber in the heart, begins to flutter and fibrillate instead of efficiently expanding and contracting in conjunction with the heart's other chambers. This flutter prevents efficient blood transfer to the ventricle for pumping to the other parts of the body and often causes a person to feel fatigued, nervous, and as though he or she has a `racing heartbeat.'"

(Robert's brief, p. 14 n. 4 (summarizing expert medical testimony).)
[2] Dr. Hashimi performed an exploratory heart catheterization; the catheterization revealed no heart damage, no significant blockage of arteries, normal left ventricular function, and a mild narrowing of the right coronary artery that did not require treatment.
[3] Dr. Hashimi recommended the blood-thinning medication because a patient such as Lida, whose heart rhythm is in atrial fibrillation, has an increased risk of developing an embolus (i.e., a blood clot) in the heart. If a clot develops, it can be "thrown" when the patient's heart converts to a normal rhythm, creating a condition known as "peripheral embolization." (Robert's brief, p. 14 n. 5 ("Peripheral embolization occurs when a blood clot in the heart, created because of the heart's decreased ability to move blood during atrial fibrillation (i.e., stasis), breaks loose and travels to other parts of the body where it lodges and blocks the blood and oxygen supply to certain organs and extremities." (summarizing expert medical testimony)).)
[4] Robert, Teresa, and Robert and Teresa's son Todd each testified that they saw Lida "bent over" in pain, and Robert testified that she was "screaming in pain." Although Robert testified that he thought Nurse Greene was in the room when Lida was screaming in pain, Nurse Greene testified as follows:

"Q. Now, where were you and [Lida] when you got that information?
"A. We were in her room.
"Q. Where was she in her room?
"A. She was standing, kind of walking back and forth around her bed.
"Q. Amy, did you ever see [Lida] doubled over?
"A. No, sir.
"Q. Did anybody  [Lida]'s family ever tell you that she was doubled over in pain?
"A. No, sir.
"Q. When you came in that day and you got that information, was [Lida] screaming?
"A. No, sir.
"Q. Did you ever hear her screaming?
"A. No, sir.
"Q. Did anybody ever tell you she was screaming in pain?
"A. No, sir."
[5] Nurse Greene called CAM because Dr. Hashimi and Dr. DeVille were listed as Lida's admitting physicians.
[6] In particular, Nurse Swearingen testified that Nurse Greene said that

"she had a patient, Ms. Lida Tyler, who was on telemetry and who had been admitted the day before with rapid atrial fib. She had converted to sinus rhythm that morning and that afternoon she had gone back into atrial fib with elevated heart rate and elevated blood pressure.
"[Nurse Greene] told me that she had . . . taken her off of the IV Cardizem she had been on since Friday, earlier that morning. . . . She told me that she was on the pill form of Cardizem. . . . [and] Coumadin. . . . [And] [s]he was on IV Heparin. She told me she was having nausea and abdominal pain. And she had given Phenergan and Darvocet and Milk of Magnesia earlier that afternoon."
[7] Robert testified that he told Nurse Greene:

"[I]f you didn't get a doctor in here, I'm going to take her out of this room and carry her down to the emergency room where I can at least see a doctor. I mean, she's in a hospital. I remember Nurse Amy going back out of the room and calling again."
[8] Dr. Williamson and Dr. Ferguson were employed by IMC.
[9] The complaint initially named "Mobile Infirmary Medical Center" as a defendant. However, the parties stipulated before trial that the "Mobile Infirmary Association" was the proper corporate name for the entity Robert originally named as the "Mobile Infirmary Medical Center."
[10] Dr. Williamson died in March 2003, while the action was pending. The personal representative of his estate was substituted as a defendant in his place. See Rule 25, Ala. R. Civ. P.
[11] The trial court granted the Infirmary's motion to the extent it sought a JML on the negligence claims stated in subparagraphs 8.f, 8.g, and 8.h of the plaintiff's seventh amended complaint. Those claims alleged that the Infirmary had negligently caused Lida's death by:

"f. Failing to timely administer Heparin to [Lida] . . . ;
"g. Negligently administering pain medication to [Lida] before knowing the cause of her acute abdominal pain and nausea and before consulting with a physician;
"h. Negligently failing to act upon what appeared to be a significant decline in and/or change in [Lida's] condition during the early morning hours of June 6, 1999."
[12] Robert also contends that Nurse Cepero in fact testified that she practiced hands-on patient care in the year before June 1999, and he contends that Nurse Cepero "has far greater qualifications than those required by [§ 6-5-548(b)]."
[13] The record indicates that the Infirmary did object to testimony by Nurse Cepero that a consult order should have been "stat." However, there is no indication that the Infirmary objected to Nurse Cepero's qualifications.
[14] Teresa testified:

"Q. Do you remember any statements that she was making to you, or to your husband, or to your son while y'all were there in the room that afternoon and she was in this pain?
"A. Well, she just kept saying how much she was hurting. And one time, I was working  She liked to work crossword puzzles, so I was just sitting there working a crossword puzzle, and she looked at me and asked me, she said, `Teresa, do you think I'm going to make it?'"
Todd testified:
"A. When we got there, my grandma was screaming in horrible pain when we arrived, at the end of her bed crouched over holding her stomach.
"Q. Was your father there in the room at the time?
"A. Yes, sir, he was in the room.
"Q. Do you remember what he was doing?
"A. He was just tending to her and he was trying to get some help to come into the room to get something done.
"Q. Okay. Did you stay in that room most of the afternoon that afternoon?
"A. Yes.
"Q. You say your grandmother was  she was sitting up on the bed?
"A. Right.
"Q. And holding her stomach?
"A. (Nods head affirmatively).
"Q. Do you remember anything she was saying or anything she was doing at that point?
"A. She was just saying, `Bobby, I need some help. It hurts me really bad, you know.' I even remember . . . [s]he asked my mom if she thought she was going to make it a little while later."
[15] At trial, Nurse Greene testified that she could not remember specifically telling Nurse Swearingen that Lida stated she was experiencing the worst abdominal pain she had ever had. However, Nurse Greene admitted that Lida described the pain as the worst she had ever had. Nurse Greene testified:

"Q. Now, is this another focus note where you're summarizing events that have taken place?
"A. Yes, sir.
"Q. Now, I want you to read that for us, if you would.
"A. `Patient complains of nausea and pain in stomach, worst she has ever had.' . . .
"Q. Now, this, `worst she has ever had,' is that a quote right there and that a quote?
"A. That is a quote.
"Q. Where did you get that from?
"A. Well, I had asked Mrs. Tyler to describe the pain when she complained of the pain. I just asked her to describe it to me. And I asked her questions, you know, is it dull, is it aching, is it a burning pain, where is it at, and she couldn't describe it any other way to me. She said, `It's just the worst that I ever had.'"
[16] Portions of a video of Nurse Cepero's deposition were played for the jury, but those portions were not transcribed and made a part of the reporter's transcript of the trial proceedings. The Infirmary filed a motion to supplement the record on appeal to include transcribed portions of Cepero's videotaped deposition. That motion was granted.

As noted, to establish that Nurse Cepero testified as to the standard of care regarding Nurse Greene's duty to communicate to Nurse Swearingen Lida's description of her pain, Robert quotes from Nurse Cepero's deposition. Although the pages of Nurse Cepero's deposition testimony Robert quotes from are not included in the pages submitted by the Infirmary, we assume the testimony cited by Robert was in fact put into evidence at trial, because at pages 31-32 of its brief to this Court the Infirmary quotes the same testimony from Nurse Cepero that Robert quotes.
[17] Although not a part of the Robert's case-in-chief, Nurse Katrina Brown, a witness called by the Infirmary, testified:

"Q. You agree that Lida Tyler and her family had the right to have the severity of her condition accurately and effectively communicated to the doctors at [CAM]?
"A. Yes, sir.
"Q. And you agree that the nurses at the Mobile Infirmary were responsible for that communication?
"A. Yes, sir.
". . . .
"A. I think as nurses we do not necessarily determine when a patient needs a doctor unless we get to an emergency situation such as a code situation or so forth. Our job is to relay every bit of information we have to the doctor when we need to do that."
Similarly, Nurse Greene testified:
"Q. In your training as a nurse and working at the Infirmary, let me ask you if you agree with these nursing principles, all right? Do you agree that a nurse ought to exercise reasonable care?
"A. Yes, sir.
"Q. And you agree that a nurse ought to report the patient's change of condition when it's necessary?
"A. Yes, sir.
"Q. Should a nurse be accurate in what they tell somebody, whether it's another nurse or another doctor?
"A. Yes, sir."
(Emphasis added.)
[18] Robert offers at least four additional examples of conduct by the Infirmary's nurses that he contends provided sufficient evidence of negligence. However, because there is sufficient evidence that Nurse Greene was negligent in failing to accurately report Lida's pain to Nurse Swearingen, we pretermit discussion of any additional evidence of negligence by the Infirmary.
[19] During his case-in-chief, Robert presented testimony from Dr. Joel Feinstein, a board-certified physician in internal medicine and gastroenterology. Dr. Feinstein opined that Lida "threw" an embolus on Saturday, which, he testified, eventually lodged in her superior mesenteric artery. According to Dr. Feinstein, the embolus then cut off or significantly limited the blood supply in that artery, eventually resulting in necrosis of the bowels.
[20] Nurse Greene testified:

"Q. You're aware that if there is a blood clot, it can cut off the oxygen supply to the organs?
"A. Yes, sir.
"Q. You knew that in 1999, right?
"A. Yes, sir.
"Q. And if that happens, it's life threatening?
"A. Yes, sir.
"Q. And if that happens ultimately what's going to need to happen is a surgeon is going to have to take care of that?
"A. Yes, sir."
[21] In addressing the issue of causation, the Infirmary does not address in its briefs to this Court the evidence on which Robert relies to assert that, had Dr. DeVille been properly informed, he would have initiated a surgical consult, which, in turn, probably would have resulted in Lida's survival. Instead, although it states generally that there was "absolutely no evidence . . . that an earlier examination . . . by any physician would have resulted in a different diagnosis, different treatment plan, or different outcome for [Lida]," the Infirmary addresses its specific arguments regarding causation only to the question whether an earlier consult with a gastroenterologist would have resulted in a different outcome; as to that specific question, the Infirmary contends there was not sufficient evidence of causation.

Thus, the Infirmary does not specifically address Robert's alternative theory of causation, which is that Nurse Greene's failure to accurately communicate Lida's symptoms of pain caused Dr. DeVille to fail to order a surgical consult, which, in turn, prevented Lida from receiving a timely life-saving surgical procedure.
[22] Dr. Ruben also testified that in extreme emergencies the time needed for an angiogram or arteriogram can be shortened, because an experienced surgeon can "feel with [his] hands" within the patient's abdominal cavity to determine where a clot is located.
[23] Dr. Ruben's testimony was supported by other evidence in the record, including medical texts that were read into evidence.
[24] Dr. Ruben testified further regarding Lida's chances of survival if a timely embolectomy had been performed:

"Most patients who have an embolic event don't do so sitting on a cardiac monitor in a hospital with nurses there to get the report immediately about this event. Most of those patients do so at home, in a nursing home, in an outside institution. Many of them have advanced diseases of other types that makes the mortality high even if they do have prompt intervention.
"In addition, most of these patients are not seen promptly. Many of them have severe abdominal pain and sit at home not telling anybody or telling a family member who does not have any medical training and doesn't make much of it for several hours until they begin to see the patient deteriorate. Then these patients call the doctor who says go to the emergency room. At the point we see most of these patients, several hours have gone by and we're at the point where there is nothing we can do to change the clinical course.
"Mrs. Tyler fell into a specific category of, A, a patient with very little co-morbidity. She had atrial fibrillation, but, otherwise, she was healthy. She was a healthy vigorous person. And, B, she had this acute event in the hospital and was able to communicate this to a trained professional almost immediately. . . . [I]f we were to look at this kind of sub-set of patient and see what the morbidity would be, assuming good medical care, I suspect we would see a greater than 80 or 90 percent survival."
[25] The Infirmary's argument regarding the "good count/bad count" rule appears at pages 56-57 of its initial brief to this Court. In its entirety, the Infirmary's argument is as follows:

"Because there is insufficient evidence of proximate cause as to any of the negligence claims against the Infirmary, the judgment against the Infirmary should be reversed and rendered in favor of the Infirmary. Nevertheless, even if [Robert] failed to put on substantial evidence of negligence or proximate cause as to only one of his negligence claims, the judgment must be reversed and remanded for a new trial pursuant to the good-count, bad-count rule, which this Court has summarized [in]. . . . [Ex parte Grand Manor, 778 So.2d 173, 177 (Ala.2000)]."
(Infirmary's brief, pp. 56-57.)
[26] Section 6-5-547 provided:

"In any action commenced pursuant to Section 6-5-391 or Section 6-5-410, against a health care provider whether in contract or in tort based on a breach of the standard of care the amount of any judgment entered in favor of the plaintiff shall not exceed the sum of $1,000,000. Any verdict returned in any such action which exceeds $1,000,000 shall be reduced to $1,000,000 by the trial court or such lesser sum as the trial court deems appropriate in accordance with prevailing standards for reducing excessive verdicts. . . . "
[27] Unlike Hodgen, which involved only claims arising out of nonfatal injuries a patient suffered as a result of medical malpractice, this case involves a wrongful-death claim. Therefore, § 6-11-21(j), Ala.Code 1975, rather than § 6-11-21(d), would apply to this case. Section 6-11-21(j) states that "[t]his section shall not apply to actions for wrongful death or for intentional infliction of physical injury." Even so, Hodgen noted that "[s]ection 6-11-21, Ala.Code 1975, as so amended, has been recognized as a complete replacement of the old statutory restrictions on punitive damages." 884 So.2d at 814 (citing Morris v. Laster, 821 So.2d 923, 927 (Ala.2001) (emphasis added)).
[*] Note from the reporter of decisions: On April 13, 2008, the Supreme Court clerk's office issued a certificate of judgment, amending its previous certificate of judgment in this case issued on October 4, 2007, and stating, in part:

". . . WHEREAS, the appellee filed notice on September 20, 2007 of his acceptance of remittitur;
"IT IS ORDERED that the judgment entered will be:
"Affirmed."